**OZARK EMPLOYMENT SPE-
CIALISTS, INC., Appel-
lant–Respondent,**

v.

**Deborah BEEMAN d/b/a Beeman
Technical Search, Respondent–
Appellant.**

**Nos. WD 59932, WD 59993.**

Missouri Court of Appeals,
Western District.

July 30, 2002.

Rebecca M. Randles, Shawnee, KS, for Appellant–Respondent.

Max Von Erdmannsdorff, Kansas City, MO, for Respondent–Appellant.

Before BRECKENRIDGE, P.J., LOWENSTEIN and SMART, JJ.

HAROLD L. LOWENSTEIN, Judge.

Ozark Employment Specialists, Inc. (OES), an Arkansas corporation, sued Deborah Beeman d/b/a Beeman Technical Search (BTS), for breach of contract and for tortious interference with a contract. The trial court overruled Ms. Beeman's motions to dismiss, for directed verdict and for judgment notwithstanding the verdict, in which she argued that because OES did not obtain a certificate of authority to transact business in Missouri, it could not maintain its proceeding in court against BTS under § 351.574.1, RSMo 2000.[1] After the trial, the court sustained BTS's motion for directed verdict on the tort count and submitted the contract count to the jury. The jury returned a verdict of $16,800 for OES on the breach of contract claim. OES appealed and BTS has filed a cross-appeal.

OES claims the trial court erred in: 1) granting Ms. Beeman's motion for directed verdict regarding the tortious interference with a contract claim; 2) failing to submit the issue of future lost profits to the jury; 3) refusing to submit a punitive damages instruction; and 4) dismissing Patrick Beeman, Ms. Beeman's husband, from the case. Ms. Beeman argues in her cross-appeal that the trial court erred in overruling her motions to dismiss, for directed verdict and for judgment NOV in that OES lacked standing to maintain its suit

---

1. All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise indicated.

because of its failure to obtain a certificate of authority to transact business in Missouri. This court finds: 1) OES's activities in Missouri were incidental to interstate commerce, thus not requiring it to obtain a certificate of authority to maintain this proceeding as required by § 351.574.1; 2) OES failed to make a submissible case of tortious interference with contract; 3) OES's claim of lost profits was too speculative to submit the issue to the jury; and 4) OES's points concerning punitive damages, special damages, and dismissal of Patrick Beeman from the suit need not be reviewed because a submissible case of tortious interference with contract was not made. The judgment of the trial court is affirmed.

### Factual and Procedural Background

OES, is an Arkansas corporation that recruited Philippine computer programmers for jobs at companies in the United States. Ms. Beeman operated BTS out of her Liberty, Missouri, home. One of her clients was IBS Corporation (IBS), a Swedish company operating in California. Ms. Beeman recruited computer programmers for IBS. In January of 1998, Ms. Beeman placed an advertisement in the Kansas City Star seeking computer programmers for placement with IBS. David Waddell, the principal shareholder and recruiter for OES, saw Ms. Beeman's ad on the internet and thought he could recruit programmers from the Philippines for IBS. Waddell contacted Ms. Beeman, and after several conversations, Waddell, Ms. Beeman and her husband, Patrick Beeman, met at Mr. Beeman's law office in Liberty, Missouri. The parties agreed to enter into a business relationship in which OES would recruit Philippine programmers for IBS through its agent, Ms. Beeman.

Waddell explained to the Beemans that in order for him to be able to recruit programmers in the Philippines he had to work with a local Philippine agency and that the agency required a fee of between $1,500 and $2000 per recruited programmer.[2] The Philippine agency Waddell had a relationship with was Highway Manpower Services and Promotions, Inc. (Highway Manpower).

The parties entered into a contract, written by Ms. Beeman, which specified, with regard to fees, "50/50 split of twenty percent of annual salary; Philippine agency fee of $1,500–$2,000 per applicant to be paid before split (if not covered by Company)."[3]

After the contract was signed, Waddell began recruiting programmers in the Philippines. After IBS interviewed the candidates recruited by Waddell, it offered employment contracts to fifteen programmers. Fourteen accepted a contract with IBS. Twelve of the programmers came to the United States to work for IBS. After the twelve programmers completed their first month of work at IBS, IBS paid Ms. Beeman. Ms. Beeman then sent OES its portion of the proceeds. Upon receipt of the proceeds, Waddell claims to have realized that although Ms. Beeman paid Highway Manpower directly the $500 per recruit Philippines Overseas Employment Administration (POEA) fee, the $1,500 per recruit agency fee (totaling $18,000) had not been paid to Highway

2. Typically recruits have to pay their own fees. Waddell explained that recruitment in the Philippines is competitive and that he would be more successful if OES and BTS paid the fees for the programmers and split the cost.

3. The parties agreed to lower the fees to fifteen percent and IBS agreed to give Ms. Beeman a $30,000 advance.

Manpower. Mr. Waddell then claims to have paid $9,000 of his commission to Highway Manpower. He contacted Ms. Beeman and requested her to pay the other $9,000. After attempting to call Ms. Beeman several times, Waddell sent Ms. Beeman a letter requesting her to send $9,000 to Highway Manpower so as to not jeopardize his relationship with them. When he did not receive a response, Waddell sent Ms. Beeman a second letter explaining the consequences of not paying Highway Manpower its fee. Ms. Beeman responded to Waddell's letter stating that she did not intend to pay the fee. Waddell then sent Ms. Beeman a "desperate" e-mail claiming that if Highway Manpower did not receive its fees, the programmers that had yet to arrive in the United States would not be allowed to make the trip, and that action could be taken against the programmers already in the United States.

Mr. Beeman sent a letter to Waddell requesting an invoice from Highway Manpower reflecting the fees owed. Waddell sent Mr. Beeman an outstanding invoice from Highway Manpower showing a $9,0000 debt. (Waddell testified at trial that he could prove he was billed for $9,000, but could not prove that he paid it.)

After the Beemans received the invoice, Mr. Beeman sent a letter to Highway Manpower informing them that Waddell threatened IBS and the recruited programmers, by claiming that sanctions and penalties could be assessed against them if BTS did not pay $9,000 to Highway Manpower. The letter also stated that Waddell had received the monies owed him by BTS and that any additional fees owed to Highway Manpower was the sole responsibility of Waddell.

Waddell contends that because of this letter, Highway Manpower refused to have further dealings with OES, resulting in him being unable to do business in the Philippines. Waddell claims he paid the $9,000 to Highway Manpower with a loan from his mother. Waddell also claims that since Highway Manpower terminated their relationship, the two programmers who had not yet come to the United States were barred from doing so—costing OES and Ms. Beeman $9,300 each in commissions.

Waddell subsequently filed a two-count petition against Deborah and Patrick Beeman and BTS for breach of contract and tortious interference with contract. Prior to trial, Mr. Beeman was dismissed from the case. After the evidence was heard at trial, the trial judge granted Ms. Beeman's motion for directed verdict regarding the issue of tortious interference with a contract and did not submit the issue to the jury. The court entered judgment on the verdict on the breach of contract claim. The jury verdict in favor of Waddell on the breach of contract claim for $16,800 appears to include $7,800 (the amount the parties would have received in recruitment fees, $9,300, for the two programmers who were not allowed to come to the U.S. minus half of the agency fees to be paid by each party equals $7,800) and $9,000 (the agency fees BTS refused to pay). Other facts will be more fully developed *infra.*

### I.

This court will first take up Ms. Beeman's cross-appeal. Ms. Beeman argues that the trial court erred in overruling her motion to dismiss, motion for directed verdict, and motion for judgment NOV concerning OES's failure to obtain a certificate of authority to transact business in Missouri.

 The standard of review for the denial of a motion for judgment notwithstanding the verdict is essentially the same

as that for the denial of a motion for directed verdict. *Poloski v. Wal–Mart Stores, Inc.,* 68 S.W.3d 445, 448 (Mo.App. 2001). Judgment notwithstanding the verdict for the defendant is only appropriate if the plaintiff fails to make a submissible case. *Id.* When reviewing the denial of a motion for directed verdict or judgment notwithstanding the verdict, this court views the evidence and reasonable inferences therefrom in the light most favorable to the verdict. *Bari v. Lindell Trust Co.,* 996 S.W.2d 655, 658 (Mo.App.1999). If the grant or denial of a directed verdict or judgment notwithstanding the verdict is based upon a conclusion of law, this court reviews the trial court's decision *de novo. Kinetic Energy Dev. Corp. v. Trigen Energy Corp.,* 22 S.W.3d 691, 697 (Mo.App. 1999).

OES is an Arkansas corporation which did not obtain a certificate of authority to transact business in Missouri. Section 351.572.1 states that "[a] foreign corporation may not transact business in this state until it obtains a certificate of authority from the secretary of state." Under § 351.574.1, "[a] foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority." Thus, Beeman filed a motion to dismiss arguing that OES did not have a certificate of authority to transact business in Missouri, and pursuant to § 351.574.1, it could not maintain its action. Beeman's motion to dismiss contended that filing a lawsuit in Missouri constituted doing business in Missouri. Beeman's motion to dismiss was taken up prior to trial; however, the trial court withheld ruling on the motion until after evidence was heard. Beeman's motion for directed verdict/motion to dismiss at the close of OES's case claimed that Waddell's travelling to Missouri to conduct business constituted "transacting business"

in Missouri citing *Campaign Works Ltd. v. Hughes,* 779 S.W.2d 305, 307 (Mo.App. 1989). After OES presented its case, the trial court found that OES did not "transact business" in Missouri and that "whatever contacts that corporation had with Beeman were incidental to interstate, well also international commerce." Beeman's motion for judgment notwithstanding the verdict on this issue sought to have the verdict and judgment set aside on the grounds that OES had no standing and the court had no authority to submit OES's case to a Missouri court and jury. These motions were also overruled.

"The burden is on the defendant to establish that the plaintiff was unlawfully doing business within the state and was not entitled to maintain its action." *KMS, Inc. v. Wilson,* 857 S.W.2d 525, 529 (Mo. App.1993). "A finding of what constitutes 'doing business' in the state is to be determined on the facts in each individual case." *State v. Murray's,* 767 S.W.2d 127, 129 (Mo.App.1989). "Thus, the cases interpreting § 351.570 establish no clear pattern of what business activities establish 'transacting business' in Missouri so as to require registration as a foreign corporation." *Id.*

Section 351.572.2 lists activities which do not constitute "transacting business" within the meaning of § 351.572.1. They include:

(1) *Maintaining, defending, or settling any proceeding;*

(2) Holding meetings of the board of directors or shareholders or carrying on other activities concerning internal corporate affairs;

(3) Maintaining bank accounts;

(4) Maintaining offices or agencies for the transfer, exchange, and registration of the corporation's own securities or

maintaining trustees or depositories with respect to those securities;

(5) Creating or acquiring indebtedness, mortgages, and security interests in real or personal property;

(6) Securing or collecting debts or enforcing mortgages and security interests in property securing the debts;

(7) Conducting an isolated transaction that is completed within thirty days and that is not one in the course of repeated transactions of a like nature;

(8) *Transacting business in interstate commerce.*

(Emphasis added).

■ Contrary to Beeman's assertion in her motion to dismiss, filing a lawsuit does not constitute "transacting business" pursuant to § 351.572.2(1). Beeman also argues that the trial court erred in finding that "whatever contacts that corporation had with Beeman were incidental to interstate, well also international commerce." Beeman contends that allowing OES to avail itself of Missouri courts under the interstate commerce exception included in § 351.572.2(8) would be in opposite to the holding of *Campaign Works Ltd.,* 779 S.W.2d 305.

In *Campaign Works,* The Campaign Works, Ltd., a Florida corporation, sued Doug Hughes for failure to pay an unpaid account for services. Campaign Works was owned and operated by Daryl Glenney who worked as a consultant to political candidates and to affiliated organizations. Campaign Works entered into a contract with Mr. Hughes, to render services in aid of Mr. Hughes' campaign seeking election to the United States Congress.

Campaign Works maintained offices in Florida and Washington D.C. but did not have an office or employees in Missouri. The service agreement was arranged by telephone calls between Mr. Glenney in Florida or Washington and Mr. Hughes in Missouri. Any documentation by the parties was concluded by mail. Services to be rendered under the agreement included consultations with Mr. Hughes and his campaign workers in Missouri, research on the record and issues appropriate to Mr. Hughes' opponent, supervision of electoral targeting and strategy, campaign theme, scheduling and fund raising. Some of the research and report preparation was done in Florida and Washington and consultation services were performed in Missouri.

When the agreement was terminated by joint action of the parties, Mr. Hughes allegedly owed Campaign Works $8,706.86 for services already rendered. Campaign Works filed suit in Missouri court. The trial court dismissed the case without prejudice because Campaign Works, as a foreign corporation, had not procured a certificate of authority to do business in Missouri, and was therefore barred from maintaining a suit in Missouri courts.

In *Campaign Works,* this court distinguished the case from *Kayser Roth Co. v. Holmes,* 693 S.W.2d 907 (Mo.App.1985) and *Superior Concrete Accessories v. Kemper,* 284 S.W.2d 482 (Mo.1955).

In *Kayser Roth,* 693 S.W.2d 907, the plaintiff was a manufacturer of apparel whose facilities were located in Pennsylvania. Kayser Roth used manufacturers representatives to procure sales of its goods to retail clothing stores on its behalf. Orders were subject to approval when submitted to Kayser Roth at its location in Pennsylvania. The goods were shipped directly to the customer from Pennsylvania; Kayser Roth had no employees or offices in Missouri. The account in question arose out of shipments to a retail clothing store in Missouri. This court held in *Kayser Roth* that the Pennsylvania company was not barred from suing on an account as a non-registered foreign corpo-

ration because its business was conducted in Missouri under the interstate commerce exception. *Id.* at 909.

In deciding *Kayser Roth*, this court relied upon *Superior Concrete Accessories*, 284 S.W.2d at 486. Superior Concrete was in the business of manufacturing, distributing, and selling steel products. Its plant and offices were located in Chicago, Illinois. Kemper took orders in Superior Concrete's name for merchandise in Oklahoma, Kansas, and Western Missouri. Kemper would then send the orders to Chicago, where Superior Concrete would fill the orders and ship the merchandise directly to the purchaser. The Supreme Court of Missouri held in *Superior Concrete* that a foreign corporation was not subject to registration requirements in Missouri if its business consisted of the solicitation of orders for goods by a resident broker or commission merchant who maintains a local office at his own expense and the orders result in the shipment of goods from out-of-state directly to Missouri customers. *Id.* at 486.

In distinguishing *Kayser Roth* and *Superior Concrete*, this court in *Campaign Works* found that Campaign Works employed no resident broker or commission merchant to solicit orders, and did not limit its activity to shipments made from out-of-state to Missouri customers. Rather, the president and sole employee of Campaign Works own affidavit showed that he came to Missouri to provide the personal consultation and advice on campaign matters which the subject of the contract required. Further, under the express terms of the contract, services by Mr. Glenney were to be rendered in Missouri and expenses billed to the account included travel to Missouri by Mr. Glenney. *Campaign Works*, 779 S.W.2d at 306.

This court ultimately determined that the principles espoused in *Chase Manhat-* *tan Bank v. George Pontiac–Olds–GMC*, 662 S.W.2d 312 (Mo.App.1983), controlled *Campaign Works*. In that case, Chase Manhattan's assignor, Scotti Commercial, supplied a pipe bending machine to George–Pontiac and also agreed to render services including sales promotion, management counseling, training and instruction on use of the machine. Scotti was a foreign corporation not registered in Missouri. After the machine had been delivered, Scotti sent a representative to George–Pontiac to give instruction on use of the machine. A dispute arose as to the services Scotti was to provide, and George–Pontiac ceased making payments on the machine. Chase Manhattan, as assignee of the machine lease, sued George–Pontiac. The court in *Chase Manhattan* held that the services Scotti agreed to provide and did provide in Missouri after the machine was delivered, constituted doing business in the state so as to require registration as a foreign corporation. *Id.* at 315.

This court reasoned in *Campaign Works*, 779 S.W.2d at 307, that had Campaign Works merely given reports and the product of campaign research to Mr. Hughes' campaign from Campaign Works' offices in Florida and Washington, "an arguable case of interstate commerce could have been made." The court held, however, that "[o]nce appellant sent its representative to Missouri, as it did at least twice, to consult with and give advice to Hughes regarding his campaign, however, it was doing business in the state and was required to register as a foreign corporation." *Id.*

█ Although a finding of what "transacting business" in the state is to be determined by the facts of each case, the case at bar seems most analogous to *Kayser Roth* and *Superior Concrete*, rather than *Campaign Works*. In this case, BTS, located

in Missouri, contracted with OES, located in Arkansas, to find computer programmers in the Philippines to work for IBS, located in California. According to the record, the Beemans and Waddell met in Liberty, Missouri, on one occasion while in the formation stage of their relationship.[4] Otherwise, the parties spoke on the phone. The contract between the parties was signed by Beeman in Missouri and then forwarded in the mail to Waddell in Arkansas for his signature. After Waddell gathered resumes of recruits, he would fax the resumes to Beeman. Beeman would screen the candidates over the telephone to make sure their qualifications matched their resumes and then forward the resumes to IBS in California. IBS interviewed the candidates over the telephone as well. Once the successful candidates were allowed to come to the United States, they went directly to California to work for IBS.

Unlike *Campaign Works,* the purpose of the contract between OES and BTS was not to be performed in Missouri. Rather, like *Kayser Roth* and *Superior Concrete,* OES utilized an independent agent in Missouri to find a "buyer" for its product—which in this case happened to be computer programmers. And similar to the products in *Kayser Roth* and *Superior Concrete* that were sent directly to the buyer from the companies' office or place of business in another state, the programmers traveled directly from the Philippines to IBS in California.

Therefore, it appears that OES's activities in Missouri were in fact incidental to interstate commerce. Thus, BTS did not meet its burden to prove that OES was

unlawfully doing business in Missouri. As such, the trial court was correct in allowing OES to maintain its action in Missouri against BTS.

## II.

OES argues in its first point that the trial court erred in granting Beeman's motion for directed verdict on OES's claim of tortious interference with a business relationship in that OES provided sufficient evidence for submission of the issue to the jury. OES claims its evidence showed that it had a valid business relationship with Highway Manpower and that it would have continued into the foreseeable future but for the acts of BTS.

■ A directed verdict is a drastic action. *Lyn–Flex West, Inc. v. Dieckhaus,* 24 S.W.3d 693, 695 (Mo.App.1999). "A presumption, therefore, is made in favor of reversing the trial court's judgment sustaining a motion for directed verdict unless the facts and inferences therefrom are so strongly against the plaintiff as to leave no room for reasonable minds to differ as a result." *Schumacher v. Barker,* 948 S.W.2d 166, 168 (Mo.App.1997).

■ When reviewing a directed verdict in favor of a defendant, this court reviews the evidence in the light most favorable to plaintiff, disregarding all contrary evidence and inferences. *Lyn–Flex West,* 24 S.W.3d at 695. This court must review the evidence to determine whether a submissible case has been made. *Gulley v. Werth,* 61 S.W.3d 293, 296 (Mo.App. 2001). In order to make a submissible case, there must be substantial evidence for every fact essential to liability. *Hensen v. Truman Med. Ctr., Inc.,* 62 S.W.3d

---

**4.** It must be noted that Waddell started a second corporation, Ozark Computer Consultants (OCC), approximately a year after he started OES. OCC employed programmers found in the United States and contracted out their services. While there is evidence in the record that Waddell visited Kansas City five or six times a year, it appears those visits were related to OCC rather than OES business.

549, 553 (Mo.App.2001). "Evidence is substantial if it has probative force on the issues, and a juror could reasonably rely on it to decide a case." *Id.* at 552. Whether evidence is substantial and whether the inferences drawn from it are reasonable are questions of law. *Simpson v. Indopco, Inc.*, 18 S.W.3d 470, 473 (Mo. App.2000). Questions of law are determined *de novo*. *McGhee v. Dixon*, 973 S.W.2d 847, 848 (Mo. banc 1998).

In this case, after the evidence was heard, the trial court ruled that OES did not make a submissible case for tortious interference with a business relationship. Specifically, the trial court found that OES did not submit an actual written contract to the court and the terms of the oral contract alluded to by OES appeared to be "vague and unknown by the Plaintiff."

■ Tortious interference with a contract or business expectancy requires proof of five elements: 1) a contract or valid business expectancy; 2) defendant's knowledge of the contract or relationship; 3) a breach induced or caused by defendant's intentional interference; 4) absence of justification; and 5) damages. *Hensen*, 62 S.W.3d at 553.

### 1. Contract or Valid Business Expectancy

■ " '[I]n an action for interference with a contractual relationship, it is not necessary that there be a binding contract in existence, but a probable future business relationship from which there is a reasonable expectancy of financial benefits is enough.' " *Id.* "The Supreme Court has defined expectancy as 'that which is expected or hoped for.' " *Id.* (quoting *Bell v. May Dep't Stores Co.*, 6 S.W.3d 871, 876 (Mo. banc 1999)). To prevail on a tortious interference claim, the expectancy must be valid or reasonable and cannot be too in-

definite or remote. *Id.; See Bell,* 6 S.W.3d at 876.

■ Waddell testified at trial that in order to recruit programmers in the Philippines, OES had to form a relationship with a Philippine agency under terms and conditions set forth by the POEA. Waddell presented as evidence two books by the POEA that govern relationships between Philippine agencies and American agencies.

Waddell testified that he began forming a relationship with Highway Manpower in 1995. It took a couple of years to cultivate their relationship since Highway Manpower would be accountable for any actions taken by OES in the Philippines. Waddell testified that OES had an oral agreement to work with Highway Manpower based upon POEA rules. Under POEA rules, all recruitment activities had to be conducted by Highway Manpower, including advertisements in the newspaper and on the radio. Initial interviews had to be done at Highway Manpower's facilities and any fees connected with the recruitment had to be paid to Highway Manpower. Waddell testified that the agreement between OES and Highway Manpower was ratified by the POEA; however, he could not give a specific date or provide a copy of the ratification.

Although the agreement between OES and Highway Manpower is vague, OES did show it had at least a valid business expectancy.

### 2. Defendant's Knowledge of the Contract or Relationship

■ There is no question that Beeman knew of Waddell's relationship with Highway Manpower. When Waddell was forming his business relationship with BTS, he informed the Beemans that in order to recruit programmers in the Philippines he had to work with a Philippine agency. He

also explained that two fees had to be paid for each programmer. A $500 processing fee to be paid to POEA, and a $1,500 fee to be paid to a Philippine agency. The contract written by Beeman between OES and BTS accounted for the Philippine agency fee. The contract stated: "FEE: 50/50 split of twenty percent of annual salary; Philippine Agency fee of $1500–$2000 per applicant to be paid before split (if not covered by Company)."

Further, during the course of the recruitment Beeman corresponded with the personnel of Highway Manpower on several occasions as shown in e-mails and other correspondence Waddell entered into evidence. In fact, Beeman paid the $500 per recruit POEA fee directly to Highway Manpower.

### 3. A Breach Induced or Caused by Defendant's Intentional Interference

▮▮▮▮▮ In order to determine whether BTS's actions caused the breach, the "but for" test is applied. *Fabricor, Inc. v. E.I. DuPont de Nemours & Co.*, 24 S.W.3d 82, 93 (Mo.App.2000). A two-step process is used to determine whether the "but for" test has been met: 1) did the defendant actively and affirmatively take steps to induce the breach; and, if so, 2) would the plaintiff's business expectancy been realized in the absence of the defendant's interference? *Id.* at 93–94.

After twelve of the recruited programmers came to the United States and completed their first month of work, IBS paid Beeman. Beeman then sent OES its portion of the proceeds. Upon receipt of the proceeds, Waddell claims to have realized that although Beeman paid Highway Manpower directly the $500 per recruit POEA fees, the $1,500 per recruit agency fees (totaling $18,000) had not been paid to Highway Manpower. Since the parties

had agreed to split the agency fees, Waddell claimed he paid $9,000 of his proceeds to Highway Manpower. He then contacted Beeman and requested her to pay the other $9,000. After several unsuccessful attempts to contact Beeman, Waddell sent Beeman a letter requesting her to send $9,000 to Highway Manpower so his relationship with them would not be jeopardized. When he did not receive a response, Waddell sent Beeman a second letter explaining the consequences of not paying Highway Manpower its fee. Waddell testified he told her that:

> [T]he most severe consequences would be that Highway Manpower could approach the P–O–E–A and declare fault, and the P–O–E–A could actually write a letter to the U.S. consulate and they could potentially have the visas of these programmers revoked; so they could potentially lose their visas. Also that IBS could potentially, you know, anybody involved in this recruitment could technically be in trouble."

He also testified that if the fee was not paid, Highway Manpower could stop any further programmers from coming over and refuse to do business. Beeman responded to Waddell's letter stating that she did not intend to pay the fee. Waddell then sent Beeman a "desperate" e-mail claiming that if Highway Manpower did not receive its fees the programmers that had yet to arrive would not be able to come and that action could be taken against the programmers already in the United States.

Mr. Beeman sent a letter to Waddell requesting an invoice from Highway Manpower reflecting the fees owed. Waddell sent Mr. Beeman an outstanding invoice from Highway Manpower showing a $9,000 debt. (Waddell testified at trial that he could prove he was billed for $9,000 but could not prove that he paid it.)

After the Beemans received the invoice, Mr. Beeman sent a letter to Highway Manpower. The letter stated:

It is our position that any fees owed to your firm is the sole obligation of Mr. Waddell. My client had expenses and obligations, which she has fully met and satisfied. Mr. Waddell has threatened my client International Business Systems, and the workers with a variety of sanctions or penalties that he claims are available to your country via the Philippine government. I am not aware of the validity of those sanctions, but I do not think they would be appropriate if they are available. IBS is extremely satisfied with the workers that they have hired. They fully intend to consider Philippine programmers for future needs. Mr. Waddell has received the monies owed him by IBS and BTS. Any additional fees owed to your company are the sole responsibility of Mr. Waddell. To penalize IBS or the workers would seem unfair and inappropriate under the circumstances. Why Mr. Waddell has chosen to fail to meet his obligations to your company is open speculation. Only he can decide if he will or can honor his part of the bargain. If you could advise as to your company's position and intentions, I would greatly appreciate it. My client wants to keep her client, IBS, and the programmers up to date on the status of this issue. Patrick Beeman.

After Highway Manpower received this letter, Nolly Dominsac, the president of Highway Manpower, faxed a copy of the letter to Mr. Waddell along with the following letter:

Dear Mr. Waddell:

We are disappointed in having received no reply to our previous request for non-remittance of your payment with regard to the programmers hired for IBS. The management came to a decision that if we have not received payment due to us by August the 7th, 1999, we shall be obliged to forward and hand it over to a lawyer for proper action, and we shall be constrained to inform P–O–E–A of your non-payment of account or to ask P–O–E–A to change—to charge the programmers the fee equivalent to one month of their salary, according to P–O–E–A circular memorandum #5 series of 1997, which fixes the ceiling of the placement fee that the land-based agency may demand and collect from hired workers in the amount equivalent to one month's salary. As we said, refusal of hired programmers to pay the fee will allow the P–O–E–A to cancel their contract apply for immediate rescind (sic) of their visa with the help of the Philippine consulate. We trust you will cheerfully comply with this second request, and we hope however that this action will not be necessary. Thank you very much for your attention. Respectfully yours, Nolly Dominsac.

After receiving this letter, Waddell claims he borrowed $9,000 from his mother and paid Highway Manpower the funds he claims that BTS owed. Waddell testified that after Highway Manpower received the letter from Mr. Beeman:

[T]he fact that it had become such a hassle, they blatantly told me that they thought that I had misrepresented to them the truth; and that according to [Mr. Beeman's letter], I had already been paid and was just not paying them; and that they would no longer do business with me; and that I would not be allowed to continue doing business in the Philippines.

As a result, Waddell testified that the other two programmers were not allowed to come to the United States (at a loss of $9,300) and he had to hire a company called QIT to recruit computer program-

mers for OCC, his company that supplies computer programmers on a contract basis. Thus, OES was no longer receiving any recruitment fees from OCC, rather Waddell had to pay fees to QIT.

Portions of Beeman's deposition were read into evidence. She testified that Waddell was unclear about the fees and that she was under the impression that Highway Manpower was a government agency, not a private employment agency. She also claims that Waddell told her that all of the fees were required by the government. Because she thought the fees were government-related, she wrote the contract the way she did because she knew IBS would pay them. She claims she would have never agreed to pay the Highway Manpower fees if she knew it was another employment agency fee.

Although the determination of whether BTS actively and affirmatively took steps to induce the breach of the business relationship between OES and Highway Manpower is a close call, it is clear from the evidence that Mr. Beeman was justified in writing the letter to Highway Manpower

#### 4. Absence of Justification

 " 'Without justification' has been defined, in the context of tortious interference with business relationships, as the absence of any legal right to take the actions that form the basis of the claim." *Vikings, USA Bootheel MO v. Modern Day Veterans*, 33 S.W.3d 709, 711 (Mo.App.2000). In general, conduct lacks justification when a defendant has employed "improper means" to further the defendant's interests to the detriment of plaintiff. *Id.* "[M]eans [are] improper if it involves acts that are 'independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the

common law.' " *Hensen*, 62 S.W.3d at 555 (quoting *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 317 (Mo. banc 1993)). No liability arises, however, from interfering with a contract or business expectancy, if the defendant had an unqualified legal right to do the action of which the petition complains. *Vikings*, 33 S.W.3d at 711.

 It appears from the evidence that BTS took appropriate action by informing Highway Manpower of the situation. The Beemans did not believe that they owed the $9,000 to Highway Manpower and the letter accurately portrayed Waddell's threats of action. In fact, Waddell himself testified that he tried to put pressure on Beeman to pay the money by writing in one letter to her that he would: call and write letters to IBS explaining to them the problem and asking for assistance; contact all of the Philippine programmers and explain to them that their agency fees are not being paid and tell them they could have their visas revoked; contact the Philippine consulate and United States consulate and ask them to take action against IBS; and have Highway Manpower file a lawsuit against IBS. Considering Waddell's behavior and threatened behavior, the Beemans were justified in finding out from Highway Manpower itself whether it thought BTS owed the $9,000 and whether the threatened sanctions against the programmers were more than merely threats. It must also be noted that the letter Mr. Beeman wrote to Highway Manpower included comments concerning how satisfied IBS was with the recruited programmers. Because Mr. Beeman's letter to Highway Manpower was not "without justification," OES has failed to make a submissible case of tortious interference with contract. Point denied.

### III.

OES argues in its second point that the trial court erred in failing to submit the

issue of future lost profits to the jury in that uncontroverted evidence showed that OES had lost accounts valued in excess of $250,000 because of Beeman's breach of contract and/or tortious interference. Because this court has already determined that OES did not make a submissible case of tortious interference with contract, our review is in regard to the breach of contract claim.

OES presented evidence at trial of its relationship with OCC, a company that Waddell has a significant ownership interest in. OCC employs programmers found in the United States and contracts out their services. OCC, like BTS, had hired OES to seek qualified programmers from the Philippines. As a result of OES no longer being able to recruit programmers in the Philippines, OCC had to hire a company called QIT to recruit programmers. Waddell produced evidence at trial that OCC hired sixty programmers from the Philippines that were recruited by QIT. Waddell claims that based upon the contracts generated by QIT, OES lost recruitment fees in the amount of $253,804. The trial court did not submit the issue of lost profits to the jury as an element of damages because it found them to be speculative.

 It is well established that competent and substantial evidence is required to support an award of damages. *Carmel Energy, Inc. v. Fritter*, 827 S.W.2d 780, 782 (Mo.App.1992). Proof of lost profits is exacting. *Anuhco, Inc. v. Westinghouse Credit Corp.*, 883 S.W.2d 910, 923 (Mo.App.1994). "Speculation as to probable or expected lost business profits is spurned, and proof of lost profits must be substantial." *Id.* (citing *Coonis v. Rogers*, 429 S.W.2d 709, 713–14 (Mo.1968)). According to the court in *Coonis:*

> The general rule as to recovery of anticipated profits of a commercial business is

that they are too remote, speculative, and too dependent upon changing circumstances to warrant a judgment for their recovery. They may be recovered only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount; and when this is made to appear, they may be recoverable. (Citations omitted).

429 S.W.2d at 714.

 In this case, the trial court was correct in finding that OES's claim of future lost profits was speculative. The only evidence on this matter provided by OES was Waddell's testimony that the recruitment business for OCC was done by QIT. He provided the contracts of all of the programmers hired by OCC and testified that he had to pay at least a twelve percent recruitment fee to QIT on each contract. Basically, Waddell claims that because QIT was successful in recruiting sixty programmers, OES would have received the same fees QIT received had it been able to do the recruitment. It does not automatically flow, however, that because QIT was successful in recruiting sixty programmers in the Philippines for OCC, that OES would have been able to achieve the same result. While lost profits may be recoverable when they are shown to have been the natural and probable consequences of an act or omission, they must be shown by reasonable certainty. *S. Mo. Bank v. Fogle*, 738 S.W.2d 153, 158 (Mo.App.1987). This evidence does not provide a reasonable certainty that OES would have recruited the same sixty programmers and received the same fees had it done the recruiting for OES. Point denied.

**IV.**

OES argues in its third point that the trial court erred in refusing to submit a

punitive damages instruction to the jury. OES only prayed for punitive damages under its tortious interference with contract claim in its petition. Because a submissible case of tortious interference with contract was not made, this point need not be reviewed. *See Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 416 (Mo.App.2000) (party was precluded from seeking a punitive award because he was not entitled to submit on actual damages in that all of the tort remedies he pleaded were ruled against him on summary judgment because he could not satisfy at least one element of each count raised).

## V.

OES's fourth and fifth points both pertained to the tortious interference with contract claim. One point sought special damages for tortious interference with contract, and the other claimed the trial court erred in dismissing Mr. Beeman from the case prior to trial without making any findings "because an attorney cannot commit actions known to be tortious under the guise of representation." These points need not be reviewed due to the this court's finding *supra* that OES failed to make a submissible case for tortious interference with contract.

The judgment of the trial court is affirmed.

All concur.