In re TRI–RIVER TRADING
LLC, Debtor.

Jody DeBold, Plaintiff,

v.

E. Rebecca Case, Chapter
7 Trustee, Defendant.

Bankruptcy No. 03–42322–659.
Adversary No. 03–4703–659.

United States Bankruptcy Court,
E.D. Missouri,
Eastern Division.

Oct. 18, 2004.

**68**

Robert E. Eggmann, St. Louis, MO, for Debtor.

Howard S. Smotkin, St. Louis, MO, for Chapter 7 Trustee.

E. Rebecca Case, Saint Louis, MO, Chapter 7 Trustee.

Peter D. Kerth, St. Louis, MO, for Plaintiff.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATHY ANN SURRATT–STATES, Bankruptcy Judge.

The matter before the Court is Plaintiff's Complaint for Declaratory Judgment against Defendant Trustee to declare that settlement proceeds are not property of the Debtor's Bankruptcy Estate. Defendant Trustee filed an Answer to Complaint for Declaratory Judgment denying Plaintiff's entitlement to any of the settlement proceeds. Upon consideration of the record as a whole, the Court makes the following FINDINGS OF FACT:

In March of 1999, Plaintiff Jody DeBold ("DeBold") was approached by Phil Thornton ("Thornton") who expressed an interest in forming a barge freight trading company. At that time, DeBold was employed by Ceres Consulting, Inc. ("Ceres") and Thornton was an employee of Jersey Grain, Inc. ("Jersey"). Thornton represented to DeBold that he managed and controlled Jersey's freight trading operations. The parties agreed to form a new company, to be managed by DeBold, that would manage the grain shipping needs of Jersey and three other grain shippers. Thornton told DeBold that four companies, including Jersey, were interested in allowing the new venture to manage their grain shipping needs. Thornton also prepared pro forma financial projections based on the shipping needs of two of the four companies to demonstrate the lucrative profits the new venture could generate.

There is no evidence in the record that DeBold verified or investigated Thornton's representations with regard to the viability of the company. DeBold thereafter resigned from Ceres to fulfill her dream of owning a company.[1] Soon after DeBold resigned from Ceres, three of the four companies pulled out of the proposed venture leaving only Jersey. DeBold was concerned about the financial viability of the new venture given the departure of three of the four companies. Nevertheless, DeBold and Jersey negotiated and signed an operating agreement ("Operating Agreement") to form Tri–River Trading, LLC ("Tri–River" or "Debtor"). There was an oral agreement between Jersey and Thornton to use Tri–River for all of Jersey's shipping needs (the "Agreement"). DeBold invested $100,000 of her own funds to launch Tri–River.

Tri–River was in operation trading freight on behalf of Jersey by August of 1999. Jersey placed all of its freight through Tri–River for the first eight to ten months of operation. Tri–River generated a slight profit although there were difficult market conditions at the time. DeBold

---

1. Trustee's Ex. 7.

thereafter established positions months in advance in an effort to take advantage of future changes in market conditions based on Jersey's past and projected shipping needs.

Soon after Tri–River was formed, Jersey arranged for a $1,000,000.00 unsecured line of credit for Tri–River with Co–Bank, a financial institution with its principal place of business located in the City of St. Louis, Missouri. Tri–River was able to trade freight with a number of transportation companies with the Co–Bank line of credit and Jersey's backing.

Thornton allegedly thereafter began to make sexual advances toward DeBold. Thornton often scheduled business meetings with DeBold; however, Thornton allegedly discussed his desire to engage DeBold in a personal relationship at these meetings. There were two specific instances of alleged misconduct where Thornton inappropriately touched DeBold in a sexually offensive manner.[2] DeBold objected to each of Thornton's advances, and in September of 2000, made Hugh Moore, Jr.[3] ("Moore") and Jersey aware of Thornton's offensive behavior towards her.

Thornton later began to purchase barge transportation with other companies in St. Louis, Missouri without utilizing Tri–River as the parties originally contracted pursuant to the Agreement. Thornton also caused Co–Bank to withdraw its line of credit from Tri–River. DeBold learned that Jersey decided to no longer place freight with Tri–River. Thereafter, DeBold informed Jersey that it was required to deal exclusively with Tri–River. Thornton orally confirmed that Jersey was obligated to purchase all of its freight transportation needs with Tri–River pursuant to the Agreement. Nevertheless, Jersey con-

tinued to place freight with other transportation companies. Consequently, many transportation companies that dealt with Tri–River pulled out, demanded immediate payment, and placed extreme minimums on the number of barges in which they would allow Tri–River to trade. Once it became reasonably certain to DeBold that Jersey would not honor the Agreement by utilizing Tri–River for its transportation needs, Tri–River was forced to unwind market positions for future shipping contracts at an estimated loss of $800,000.

DeBold and Tri–River thereafter filed a civil action in the Circuit Court of the City of St. Louis, Missouri on July 9, 2002, against Defendants Thornton, Moore, and Jersey (collectively "Defendants") and in the First Amended Petition ("State Court Petition") alleged specific counts of (i) Breach of Contract and Specific Performance; (ii) Breach of Oral Contract; (iii) Fraud in the Inducement; (iv) Negligent Misrepresentation; (v) Tortious Interference with Business Relationships; and (vi) Breach of Fiduciary Duties. The Law Offices of Gretchen Myers, P.C. ("Myers") represented both Debtor and DeBold as Joint Plaintiffs in the State Court cause of action. Although there are a few paragraphs in the allegations common to all counts of the State Court Petition, DeBold failed to plead a specific count of a sexual harassment claim against the Defendants. The case settled for a sum of $800,000 (the "Settlement") and each Defendant was granted a release on February 12, 2003, when the Release of All Claims and Settlement Agreement ("Settlement Agreement") was signed. DeBold alleges that $200,000 of the Settlement was provided through insurance coverage that was available only with respect to her separate

---

**2.** Trustee's Ex. 2.

**3.** Hugh Moore, Jr. was the President of the Board of Directors of Jersey Grain, Inc.

claims for sexual harassment. DeBold presented no evidence to support this allegation. The Settlement Agreement, although quite extensive, failed to make an allocation of the proceeds between DeBold and Tri–River.

### PROCEDURAL POSTURE

This matter arises under and is related to an involuntary bankruptcy petition filed against Tri–River on February 27, 2003. An Order for relief was entered under Chapter 7 of the Bankruptcy Code on April 11, 2003.

DeBold filed a Complaint on July 14, 2003, for a Declaratory Judgment naming E. Rebecca Case, the duly appointed Chapter 7 Trustee ("Trustee"), as Defendant. DeBold seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), to determine the respective rights of DeBold and Trustee regarding the Settlement Proceeds arising from the State Court cause of action where DeBold and Debtor were Joint Plaintiffs. DeBold claims that she incurred actual losses of $520,000 based on her investment, her lost investment, and her lost salary. DeBold avers that out of the Settlement, $700,000 belongs to De-Bold individually and Trustee is entitled to only $100,000 on behalf of the Estate of Debtor. DeBold further avers that attorney's fees and costs incurred during the process of securing the Settlement should be shared proportionately between herself and Trustee. The total fees and expenses paid to Myers from the Settlement for representation was $271,169.62, which left $528,830.38 in net settlement proceeds ("Net Settlement Proceeds"). Therefore, DeBold avers that she is entitled to seven-eighths (7/8s) of the Net Settlement Proceeds with the remainder to be paid to Trustee for the benefit of the Estate of Debtor.

Trustee filed an Answer to the Complaint for Declaratory Judgment (the "Answer") denying DeBold's entitlement to any portion of the Net Settlement Proceeds. Trustee raises the following arguments in her Answer. First, DeBold paid no portion of Myers' legal fees and expenses. There was an initial $2,000 check issued by Debtor to Myers at the time Myers was retained. Myers was later paid $20,000 by Debtor for litigation expenses. Myers was therefore paid a total of $22,000 for its retainer and expenses prior to the Settlement. Myers was paid an additional $266,640.00 in fees out of the Settlement. Myers was then reimbursed for expenses over and above the retainer out of the Settlement, which amounts to an additional $4,529.62 in expenses for a total of $271,169.62. Therefore, Debtor paid Myers a total amount of $293,169.62 in attorney's fees and expenses.

Second, DeBold was only entitled to receive a bonus based upon net profits incurred after all expenses were paid. However, Debtor failed to generate a net profit during its three and a half years of operation. Yet, DeBold received her full salary during the time that Debtor was in operation pursuant to the Operating Agreement. Furthermore, DeBold worked approximately seven (7) years as a barge freight trader and thirteen (13) years in the barge industry. DeBold did not actively seek out maritime job positions at the time of trial. DeBold did inquire about jobs in the industry and became aware that: (1) there was a gradual downturn in the barge freight trading industry for the last ten (10) to twelve (12) years and no jobs were currently available; (2) the downturn became extensive in late 2001; and (3) DeBold's chances for obtaining a job in the barge trading industry was slim. Ceres, De-Bold's former employer owns and operates barges at a loss. Therefore, DeBold's em-

ployment opportunities are limited due to other factors unrelated to this case.

Last, Debtor suffered losses as a result of the misconduct of the Defendants. These losses were estimated by Thomas L. Hoops ("Mr.Hoops"), an accounting expert for the State Court action to be $877,238. These figures are estimates based upon information presented by DeBold to Mr. Hoops. The losses incurred during the wind up are roughly equivalent to the amount of money that Debtor currently owes its creditors. Therefore, the Net Settlement Proceeds should be paid to the Trustee to satisfy creditors.

Trustee also filed a Third–Party Complaint to Compel Turnover of Property by a Custodian Pursuant to 11 U.S.C. § 543 against Myers, which held the Net Settlement Proceeds in its trust account. The Bankruptcy Court entered an Agreed Order Regarding Third–Party Complaint to Compel Turnover of Property by a Custodian Pursuant to 11 U.S.C. § 543 on October 27, 2003, which required Myers to deposit the Net Settlement Proceeds into the Registry of the United States Bankruptcy Court for the Eastern District of Missouri. Myers deposited the Net Settlement Proceeds accordingly.

A trial on this matter was held on November 3, 2003. DeBold appeared by counsel and in person. Trustee appeared by counsel and in person. DeBold testified that she was aware that no allocation was made in the Settlement Agreement. DeBold also presented the testimony of her former attorney from Myers, David S. Corwin. DeBold also introduced Mr. Hoops' deposition testimony into evidence as to the past and future losses of Debtor associated with the Defendants' improper conduct. Mr. Hoops' deposition testimony encompassed a valuation of both DeBold's personal claims as well as Debtor's claims.

## JURISDICTION

The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 81–9.01 of the United States District Court for the Eastern District of Missouri. Venue is proper under 28 U.S.C. § 1409(a) (2003).

## CONCLUSIONS OF LAW

■ The sole issue before the Court is the manner in which the Net Settlement Proceeds should be apportioned between DeBold and Trustee. "In a case of actual controversy within its jurisdiction... any court of the United States... may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree..." 28 U.S.C. § 2201(a) (2003).

■ Bankruptcy Courts have authority to issue declaratory judgments where the matter in controversy involves the administration of a pending bankruptcy estate. *Sears, Roebuck and Co. v. O'Brien,* 178 F.3d 962, 964 (8th Cir.1999). The party seeking a declaratory judgment must bear the burden of proof in these proceedings. *Reliance Life Ins. Co. v. Burgess,* 112 F.2d 234, 238 (8th Cir.1940). The declaratory judgment will be determined by weighing the evidence of each party. *Id.* Here, DeBold seeks declaratory judgment of her rights to a portion of the Net Settlement Proceeds, so DeBold must meet her burden of proof based on the evidence presented at trial. The Court will weigh the merits of the original Counts based on the evidence relative to each party. Accordingly, the Court will make its determination pursuant to Missouri law.

### Breach of Oral and Written Contract

■ Counts I and II of the State Court cause of action against the Defendants were for breach of oral and written contract. Under Missouri law, in order to succeed in a breach of contract claim, a plaintiff must prove that (1) a contract exists; (2) that plaintiff had certain rights and defendant certain obligations or duties under the contract; (3) that defendant breached the contract; and (4) plaintiff suffered damages. *Taryen Development, Inc. v. Phillips 66,* 31 S.W.3d 95 (Mo.Ct. App.2000) (citing *Trotter's Corp. v. Ringleader Restaurants, Inc.,* 929 S.W.2d 935, 939 (Mo.Ct.App.1996)).

■ Here, there were both oral and written agreements detailing the rights of DeBold, Debtor, and the Defendants in the State Court Action, so there were enforceable contracts between the parties sufficient to satisfy the first element. Defendants were required to purchase freight solely through Debtor under the Agreement. Defendants were also not allowed to sell their interest in Debtor pursuant to section 10 of the Operating Agreement without first allowing DeBold and Debtor a right of first refusal. Defendants breached the Agreement when Thornton began to purchase freight through other firms. Defendants also breached the Operating Agreement by attempting to sell their interest in Debtor in violation of section 10 of the Operating Agreement. Consequently, Defendants' breach of both the Agreement and the Operating Agreement caused Debtor to incur damages of over $800,000 due to the unwinding of contracts.

■ However, there is insufficient evidence before the Court to support DeBold's claim for damages. DeBold avers that she suffered damages proximately related to Defendants' actions. The sole basis for DeBold's damages claim is that she is no longer able to attain gainful employment in the barge freight trading industry. However, DeBold's lack of employment options in the barge freight trading industry can be reasonably attributed to other factors. First, DeBold admits that she has not actively searched for a position in the barge industry. Second, there has been a gradual downturn in barge freight trading over the past decade. Last, DeBold's reputation in the barge industry is proximately related to DeBold's management of Debtor and Debtor's inability to pay its creditors.

Furthermore, DeBold was well compensated during her tenure as manager of Debtor. DeBold was entitled to receive a bonus of ten percent (10%) of the net profits in addition to her salary. DeBold earned a salary of $223,750.00 during the same period of time that Debtor earned no profits and incurred more than $800,000.00 in debt. Under these circumstances, equity requires that the creditors in this case be paid by Debtor before DeBold is entitled to receive a distribution of profits. *Accord In re BMW Group I, Ltd.,* 168 B.R. 731, 735 app. (Bankr.W.D.Okl.1994) (citing Elizabeth Warren, *A Theory of Absolute Priority,* 1991 ANN. SURV. AM. L. 9 (1991)). Therefore, DeBold's claim for damages based on a breach of contract theory is denied.

### Fraud in the Inducement

■ Count III of the State Court Petition was Fraud in the Inducement. To prevail on the issue of fraud in the inducement under Missouri law, the plaintiff must prove each of the following elements: (1) a material representation to plaintiffs; (2) such representations were false when made; (3) the agents making the representations knew they were false; (4) the representations were made with the purpose of deceiving plaintiffs; (5) plaintiffs were, in fact, deceived; (6) plaintiffs reasonably

relied on the representations; and (7) plaintiffs suffered damage as a proximate result of the fraudulent misrepresentations. *Trotter's Corp. v. Ringleader Restaurants,* 929 S.W.2d 935, 939 (Mo.Ct.App. 1996) (citing *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 386 (Mo.1993)). The defendant need not disprove each of these elements; it need only establish that one element is lacking. *Id.*

■ Here, Thornton proposed a business venture to DeBold, which culminated in the formation of Debtor. Debtor was thereafter formed and operated for three and a half years. There is no evidence in the record that Thornton's initial proposition to DeBold was made solely to engage her in a personal relationship since DeBold left Ceres for the purpose of pursing her own company.[4] Trustee presented persuasive evidence that DeBold was not deceived by Thornton thus disproving a crucial element. Therefore, DeBold's claim for fraud in the inducement is denied.

### Negligent Misrepresentation

■ Count IV of the State Court Petition was for negligent misrepresentation. Under Missouri law, a plaintiff must establish the following elements to maintain a cause of action for negligent misrepresentation: (1) the defendant supplied information in the course of its business or because of some other pecuniary business; (2) due to the defendant's failure to exercise reasonable care or competence in obtaining or communicating this information, the information was false; (3) the defendant intentionally provided the information for the guidance of a limited group of persons in a particular business transaction; (4) the plaintiff justifiably relied on the information; and (5) as a result of the

plaintiff's reliance on the statement, the plaintiff suffered a pecuniary loss. *Mark Twain Bank v. Jackson, Brouillette, Pohl, & Kirley, P.C.,* 912 S.W.2d 536, 538 n. 2 (Mo.Ct.App.1995); *see also Kesselring v. St. Louis Group,* 74 S.W.3d 809, 813 (Mo. Ct.App.2002). A party cannot prevail on the issue of justifiable reliance where it chose to ignore all signs of irregularity and the hardship it experienced was brought on by its own actions. *Id.* at 540.

■ Here, DeBold argues that Thornton misrepresented his true intentions in forming Debtor since Thornton's alleged purpose was to engage DeBold in a personal relationship. The evidence fails to demonstrate that Thornton's actions satisfy each of the required elements for negligent misrepresentation under Missouri law. Specifically, there is nothing in the record to suggest that Thornton intentionally provided information for the guidance of a limited group of persons to form Debtor. Thornton provided information for the purpose of engaging DeBold to form Debtor. Thornton's subsequent alleged improper acts fail to negate this fact. Further, DeBold suffered no pecuniary losses, since she was paid a salary for managing Debtor during its three and a half years of operation. Therefore, DeBold's claim for negligent misrepresentation fails.

### Tortious Interference with Business Relationship

■ Count V of the State Court Petition was for tortious interference with business relationships. Under Missouri law, tortuous interference with a contract or business expectancy requires proof of five elements: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's

---

4.  Trustee's Ex. 8.

intentional interference; (4) absence of justification; and (5) damages. *Ozark Employment Specialists v. Beeman,* 80 S.W.3d 882, 893 (Mo.Ct.App.2002) (citing *Hensen v. Truman Med. Ctr., Inc.,* 62 S.W.3d 549, 553 (Mo.Ct.App.2001)).

■ Here, Thornton purchased barge transportation in the City of St. Louis, Missouri, without engaging Debtor in breach of the Agreement. Thornton also caused Co–Bank to withdraw its line of credit from Debtor. Consequently, Debtor was forced to unwind its freight contracts with other transportation companies at a substantial loss as a result of Thornton's interference. Debtor sustained damages of $877,000.

■ DeBold also argues that she lost her career in the barge trading industry because of Thornton's tortious interference and is damaged to that extent. "To prevail on a tortious interference claim, the expectancy must be valid or reasonable and cannot be too indefinite or remote." *Beeman* 80 S.W.3d at 893. DeBold has no valid expectancy in future employment in the barge industry regardless of Thornton's actions given the gradual downturn in the barge freight trading industry.

Furthermore, DeBold was duly compensated for her management of Debtor although Debtor never generated a profit during its three and a half years of operation. Last, DeBold's career outlook is dwarfed in relation to Debtor's substantial pecuniary liability to its creditors. Even assuming arguendo that DeBold was damaged to some extent, the creditors of Debtor would be paid before DeBold would be entitled to receive a distribution of funds. *See In re BMW Group I, Ltd.,* 168 B.R. 731, 735 app. (Bankr.W.D.Okl.1994) (citing Elizabeth Warren, *A Theory of Absolute Priority,* 1991 ANN. SURV. AM. L. 9 (1991)). Therefore, the Court finds that Debtor held a valid claim for tortious interference

for which it should receive funds sufficient to cure its obligations to its creditors. The Court further finds that DeBold's damages are speculative, so DeBold's claim for tortious interference is denied.

### Breach of Fiduciary Duties

■ Count VI of the State Court Petition was for breach of fiduciary duties. Under Missouri law, "[a]n authorized person shall discharge his duty...in good faith, with the care a corporate officer of like position would exercise under similar circumstances, in the manner he reasonably believes to be in the best interests of the limited liability company, and shall not be liable for any such action as taken or any failure to take such action, if he performs such duties in compliance with this subsection." Mo. REV. STAT. § 347.088 (2003).

Here, Debtor may maintain an action against Defendants for breach of fiduciary duty. The Defendants' withdrawal of financial support from Debtor caused a breach of the Agreement and led Debtor to experience significant financial losses. Therefore, the Court finds that the Defendants breached a fiduciary duty owed to Debtor under § 347.088.

The Court finds that Debtor sustained damages on theories of breach of contract, tortious interference, and breach of fiduciary duties. The Court also finds that DeBold failed to meet her burden of proof to warrant a declaratory judgment. Thus, the Net Settlement Proceeds are Property of the Bankruptcy Estate. For the foregoing reasons, the Court denies the relief requested in Plaintiff's Complaint and by separate order enters judgment in favor of Trustee.

### ORDER

Upon consideration of the record as a whole, and consistent with the Findings of

Facts and Conclusions of Law entered separately in this matter,

**IT IS ORDERED THAT** the relief requested in Plaintiff's Complaint is DENIED and that judgment on this Complaint is entered in favor of Defendant, E. Rebecca Case, Chapter 7 Trustee; and this is the final judgment and order of the Bankruptcy Court in this case; and

**IT IS FURTHER ORDERED THAT** the Net Settlement Proceeds that are the issue of this Adversary Proceeding are property of the Bankruptcy Estate; and

**IT IS FURTHER ORDERED THAT** the Clerk of the United States Bankruptcy Court for the Eastern District of Missouri is to turn over the amount of $528,830.38 plus any accrued interest after deducting from the income earned in this case a fee, not exceeding the amount authorized by the Judicial Conference of the United States, to E. Rebecca Case, Chapter 7 Trustee for Tri–River Trading, LLC.