# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

————

Nos. 97-6102/6103/6104/6105NE

————

| | | |
|---|---|---|
| In re: James A. Sauer, | * | |
| | * | |
| Debtor. | * | |
| | * | |
| | * | |
| Marion Pruss and Broom, Johnson, | * | |
| Clarkson, Peppard & Pruss, | * | |
| | * | |
| Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| Joel Pelofsky, William Stock and | * | |
| Richard J. Butler, | * | |
| | * | |
| Appellees. | * | Appeals from the United States |
| | * | Bankruptcy Court for the |
| In re: J.A.S. Enterprises, Inc., | * | District of Nebraska |
| | * | |
| Debtor. | * | |
| | * | |
| Marion Pruss and Broom, Johnson, | * | |
| Clarkson, Peppard & Pruss, | * | |
| | * | |
| Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| Joel Pelofsky, William Stock and | * | |
| Richard J. Butler, | * | |
| | * | |
| Appellees. | * | |

———

Submitted: July 9, 1998
Filed: August 5, 1998

———

Before KRESSEL, William A. HILL and FEDERMAN,[1] Bankruptcy Judges.

———

KRESSEL, Bankruptcy Judge.

Appellants Marion Pruss and Broom, Johnson, Clarkson, Peppard & Pruss appeal the decision of the bankruptcy court disallowing their final fee applications and ordering disgorgement of fees. We affirm that portion of the bankruptcy court's order disallowing fees, but reduce the disgorgement amount to $43,354.21.

**Background**

James A. Sauer is a former general contractor who built and operated strip malls. In the mid-80's, Sauer created J.A.S. Enterprises, Inc., to act as the titleholder for real estate acquisitions. By April of 1990, Sauer and J.A.S. were experiencing financial difficulties. Faced with the imminent sale of his residence to satisfy judgment liens, Sauer and J.A.S. filed their Chapter 11 petitions on May 23, 1990.[2] Both Sauer and J.A.S. sought approval to employ Marion Pruss as their attorney. On July 3, 1990, the bankruptcy court approved Pruss' employment in both cases.

---

[1]The Honorable Arthur B. Federman, United States Bankruptcy Judge for the Western District of Missouri, sitting by designation.

[2]At the time of filing, Sauer owned six parcels of real estate, including his personal residence, which he valued at $138,000 with an outstanding mortgage in the amount of $103,267.76

In the period following the filing of the petitions through January 1995, Pruss filed six interim fee applications in both cases.[3] The bankruptcy court allowed fees and costs in the amount of $80,160.71 in the J.A.S. case and $56,833.02 in the Sauer case. Pruss received all of the fees in the J.A.S. case, but received no payment in the Sauer case, beyond her $1500 retainer.

In the spring of 1992, Pruss' mental and physical conditions began deteriorating. She was eventually diagnosed with depression and began taking anti-depressants. Pruss' prognosis was further complicated by the discovery of a lump in her breast on April 15, 1993. While Pruss was exploring her treatment options and contacting care providers, Household Mortgage Company sought relief from the automatic stay to commence foreclosure proceedings on Sauer's personal residence.[4] The court denied the motion when Sauer agreed to make monthly principal and interest payments.

Shortly after the hearing, Household Mortgage Company contacted Pruss to inform her of Sauer's payment schedule and amounts. Preoccupied with her ongoing medical concerns, Pruss neglected to relay the information to Sauer. Although Sauer knew he was to commence payments, he did not contact Pruss or Household to determine the amount of the payments and failed to make any payments. Household renewed its request for relief from the stay in January 1994. On March 16, 1994, the court granted Household relief from the automatic stay. On October 25, 1994, Sauer's residence was sold to Household Bank at a foreclosure sale.

In the ensuing months, Sauer made multiple attempts to purchase the property or reinstate the loan. When these efforts proved unsuccessful, Pruss formulated a plan to purchase the house on Sauer's behalf. Pruss obtained a $130,000 loan from Westroads Bank. The terms of the loan required Pruss to make a $20,000 balloon payment sixty days

---

[3]Pruss filed fee applications on September 25, 1990; January 23, 1991; June 24, 1991; December 12, 1991; July 29, 1992 and January 24, 1995.

[4]In its motion, Household Mortgage Company valued Sauer's property at $138,000, with an outstanding mortgage of $146,404.64.

following closing.[5]  On February 24, 1995, using the loan proceeds, $10,000 in personal funds and a $43,354.21 cash payment from Sauer, Pruss purchased the residence from Household Bank for $180,000.  Sauer continued to occupy the property and has resided there throughout the litigation.

On March 16, 1995, Pruss disclosed the purchase to the court and sought authorization to enter into a trust agreement and to continue her representation of Sauer.  The United States Trustee and the unsecured creditors' committee in the Sauer case objected, alleging, among other things, that a portion of Sauer's $43,354.21 payment derived from the J.A.S. estate.  They also argued that Pruss' purchase of Sauer's homestead and the subsequent trust relationship between them destroyed Pruss' disinterested status and rendered her ineligible to continue her representation of Sauer.  In the affidavit accompanying her motion, Pruss insisted that $35,000 of the funds advanced by Sauer represented compensation for his services on behalf of the bankruptcy estates and that the balance consisted of rental revenues.  In the alternative, Pruss requested permission to treat Sauer's payment as an advance towards her allowed but unpaid fees.[6]

At the April 27, 1995 hearing on the motion, the court expressed its concern over the impact of a late-day disqualification, and directed the parties to reach an agreement which would enable Pruss to continue her representation.  The court subsequently entered a stipulated order requiring Sauer to file trust documents concerning the sale of his residence, as well as a plan and disclosure statement.  The order specifically directed Pruss to use due diligence in ensuring the confirmation of the plan.

In April of 1995, Pruss became affiliated with the partnership of Broom, Johnson, Clarkson, Peppard & Pruss.  On May 8, 1995, Sauer, on his own behalf and as president for J.A.S., sought approval to employ the partnership.  On May 19, 1995, the court entered an order approving the employment of the partnership in the J.A.S. case.  On July 5, 1995, the

---

[5]Pruss made this payment using personal funds.

[6]At the time of the motion, Sauer owed Pruss $53,691.94 in allowed fees.

court entered an order approving the employment of the partnership in the Sauer case.[7] The partnership ultimately dissolved on December 31, 1995.

On July 3, 1995, Pruss filed a Notice of Intent to Enter into a Trust Agreement. The United States Trustee, the unsecured creditors' committee in the Sauer case and creditors William and Jeanette Stock objected. The objections again disputed the source of Sauer's $43,354.21 payment and cited for support the debtors' January, February and March, 1995, operating reports, which documented large, unsubstantiated transfers between the J.A.S. and Sauer estates. A subsequent investigation performed by an accountant for the Chapter 7 trustee confirmed that $20,600 of Sauer's $43,345.21 payment to Pruss originated in the J.A.S. accounts.[8] The court continued the hearing until August 31, 1995 and took the matter under advisement.

On November 21, 1995, the bankruptcy court disqualified Pruss from representing J.A.S. and Sauer. Reinvoking its May 21 and July 5, 1995 orders, the court also denied their requests to employ the partnership. Sauer and J.A.S. sought reconsideration of the November 21 order, which was denied on December 21, 1995. Although Sauer and J.A.S. appealed the disqualification orders to the district court, the appeals were dismissed as interlocutory. Pruss and the partnership no longer challenge the disqualification orders.

On June 25, 1996, on the motion of the United States Trustee, the court entered orders converting the Sauer and J.A.S. cases to Chapter 7. On June 28, 1996, Pruss filed final fee applications, requesting additional compensation in the amount of $2,166.75 in the J.A.S. case and $4,150.12 in the Sauer case. Pruss' fee applications also sought final approval of $63,559.08 in allowed fees and expenses in the J.A.S. case and $53,691.94 in allowed fees

---

[7]The July 5 order also reiterated the court's ability to review Pruss' status as attorney for Sauer upon written request or at the court's discretion.

[8]The investigation revealed that Sauer's $43,345.21 payment to Pruss derived from the following sources: $20,600 from the J.A.S. estate, $8,500 from the Sauer estate, $7,500 from a friend and $6,745.21 from unknown sources. A supplemental accounting filed by the debtor after the conversion details a similar distribution.

in the Sauer case.[9] The partnership, through Pruss, also filed final fee applications, requesting fees and expenses in the amount of $10,881.42 and $8,396.41 in the Sauer and J.A.S. cases, respectively. Although the hearing on the fee applications was originally scheduled for October 2, 1996, it was continued indefinitely on the request of the trustee. On May 8, 1997, Pruss and the partnership filed a request for hearing on the final fee applications. On May 13, 1997, the court set the hearing for June 11, 1997. The court subsequently took the matter under advisement.

In the spring of 1997, Sauer fell behind in his monthly payments and Pruss sought relief from the stay to sell the property occupied by Sauer and apply the proceeds towards the Westroads loan and her $30,000 investment. Pruss and Sauer entered into a stipulation under which Sauer agreed to cure all defaults and begin making payments to Pruss. As a result, Pruss owns the house and the equity therein, at least $43,354.21 of which is attributable to contributions by the debtors.

On October 14, 1997, the bankruptcy court disallowed the final fee applications of Pruss and the partnership. In addition, the court ordered Pruss to disgorge all fees paid in both the Sauer and J.A.S. cases--an amount exceeding $81,000. Pruss and the partnership appeal. On January 30, 1998, Pruss filed a personal Chapter 13 case.

## Discussion

We review the bankruptcy court's decision disallowing the appellants' final fee applications and ordering Pruss to disgorge her fees for abuse of discretion. Gray v. English, 30 F.3d 1319, 1324 (10th Cir. 1994), Anderson v. Anderson (In re Anderson), 936 F.3d 199, 203 (5th Cir. 1991). An abuse of discretion occurs when the reviewing court "has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." United States v. Ortiz, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986).

---

[9]The amounts which Pruss sought in her final fee application do not comport with the amounts which were actually allowed by the bankruptcy court.

In its application, the abuse of discretion standard closely approximates the clearly erroneous test.  See 1 S. Childress & M. Davis, Federal Standards of Review § 4.21, at 4-163 ("[I]n run-of-the-mill discretionary calls, review applies differently by the context, facts, and factors, but . . . many times the actual level of deference boils down to one similar to that used for the clearly erroneous rule."); Cooter & Gell v. Hartmax Corp., 496 U.S. 384, 401 (1990) ("When an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable. . . ."). A decision is clearly erroneous when the reviewing court "is left with the definite and firm conviction that a mistake has been committed."  United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

## 11 U.S.C. § 327

11 U.S.C. § 327 governs the employment of professional persons.  In particular, § 327(a) provides that:

> [T]he trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons,[10] to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a).[11]  In its November 25, 1995 order, the bankruptcy court based its determination that Pruss and the partnership were no longer disinterested--and its subsequent termination of their employment--on this provision.

---

[10]The definition of "disinterested person" appears in 11 U.S.C. § 101(14).

[11] § 1107 confers the powers of a trustee on debtors in possession.  "Subject to any limitations on a trustee serving in a case under this chapter, . . . a debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee. . . ." 11 U.S.C. § 1107(a).

<u>11 U.S.C. 328</u>

11 U.S.C. § 328 governs the compensation of professional persons.  Section 328(c) provides that:

> [T]he court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 . . . if, at any time during such professional person's employment . . . such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate. . . .

11 U.S.C. § 328(c).

By virtue of her purchase of Sauer's residence, the bankruptcy court determined that Pruss and the partnership were no longer disinterested persons and held an adverse interest.[12]

Once the court determines that the applicant is no longer disinterested or holds an interest adverse to the estate, section 328(c) authorizes the court to disallow fees earned both before and after the conflict arises.  See <u>Rome v. Braunstein</u>, 19 F.3d 54, 58 (1st Cir. 1994) ("[A]vailable sanctions include disqualification and the denial or disgorgement of *all* fees.") (emphasis added); <u>In re Spanjer Bros., Inc.</u>, 191 B.R. 738, 753 (Bankr. N.D. Ill. 1996) (noting that the court "has the discretionary authority pursuant to § 328(c) to deny compensation for any part of an attorney's services performed *outside* the conflict.") (emphasis added) (quoting <u>In re Tinley Plaza Assoc.</u>, 142 B.R. 272, 279 (Bankr. N.D. Ill. 1992)).

Furthermore, the court may order the disgorgement of fees paid both before and after the disqualifying event.  See <u>Gray</u>, 30 F.3d at 1324 (noting that court can compel the disgorgement of compensation paid to the attorney "even *before* the conflict arose.") (emphasis added); <u>In re Benjamin's-Arnolds, Inc.</u>, No. 4-90-6127, 1997 WL 86463, at *7 (Bankr. D. Minn. Feb. 28, 1997).

---

[12]As noted, Pruss and the partnership do not challenge this determination.

Although § 328(c) confers considerable discretion on the court, it does not *compel* the disallowance or disgorgement of fees. Indeed, a number of courts have noted the statute's permissive construction as the basis for a refusal to deny fees. Gray, 30 F.3d at 1324 ("The permissive 'may deny' language [of § 328(c)] does not require the court to deny legal fees or disgorge previously paid fees in all cases."); Electro-Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince), 40 F.3d 356, 359 (11th Cir. 1994) ("[T]he language of 11 U.S.C. § 328(c) *permits* a court to deny compensation to professionals found not to be disinterested persons, but does not *require* a denial of fees in those instances."); Rome, 19 F.3d at 62 (declining to adopt a "*per se* or brightline rule invariably *requiring* denial of all compensation under section 328(c).").

Courts which have disallowed fees or ordered their return have done so in the wake of egregious conduct on the part of the applicant, including failures to disclose or irredeemable conflicts. Woods v. City Nat'l Bank & Trust Co., 312 U.S. 493, 497 (1941) ("Where a claimant . . . was subject to conflicting interests, he should be denied compensation."); Rome, 19 F.3d 54 at 60 (holding that attorney's "failure to make full and spontaneous disclosure . . . provided sufficient ground for the discretionary denial of compensation under section 328(c)."); In re Prince, 40 F.3d at 361 (denying compensation because "firm operated under intolerable conflicts of interest. . . ."); Smith v. Marshall (In re Hot Tin Roof, Inc.), 205 B.R. 1000, 1003 (B.A.P. 1st Cir. 1997) ("Where the professional maintains any connections proscribed by § 327(a) and does not disclose those connections, the attorney should expect nothing more than the denial of compensation requested and disgorgement of fees received.").

We agree with the bankruptcy court that Pruss' conduct constitutes a serious breach of her ethical and professional obligations, as well as her duty to remain a disinterested person under the Bankruptcy Code. By purchasing the debtor's former household with funds advanced by the debtor and entering into the subsequent trust agreement, Pruss created landlord-tenant and trustee-beneficiary relationships with her client. In this regard, we do not disturb the findings of the bankruptcy court or disagree with its legal conclusions.

9

Notwithstanding the severity of Pruss' professional conduct, we feel that the bankruptcy court abused its discretion in ordering the disgorgement of all fees. A number of factors weigh in favor of a lesser sanction.

1.      Pruss' actions, however misguided, were the outgrowth of a well-intentioned attempt to protect the interest of her client. Pruss orchestrated the purchase of Sauer's residence merely to redress a loss for which she felt at least partly responsible.

2.      Pruss' own physical and mental condition during the events in question mitigates in favor of a reduced penalty. In the months preceding the purchase of Sauer's residence, Pruss was suffering from depression and was in the incipient stages of breast cancer. We acknowledge the possibility that her professional judgment was compromised by her medical concerns.

3.       Pruss' conduct in connection with the purchase also belies any intention to defraud her client. Notwithstanding her designation as owner, Pruss intended merely to hold the property in trust for Sauer until he raised sufficient funds to repurchase the house and return Pruss' investment. Throughout the transactions at issue, Sauer continued to occupy the property without interruption and was residing therein at the time of oral argument.

4.      Pruss made no attempt to mislead or deceive the court. Pruss immediately disclosed the purchase to the bankruptcy court and sought its approval of the transaction and her continued representation of the debtor.

5.      Following disclosure, the bankruptcy court apparently expressed an initial willingness to approve the transactions and Pruss' continued representation of the debtor, provided that she resolve the objections of the creditors' committee and the United States Trustee. In fact, the court approved the partnership's employment in both cases. Furthermore, the bankruptcy court entered the disqualification order more than eight months after Pruss' disclosure, while Pruss and the partnership continued to provide legal services and advance expenses on behalf of both debtors.

The court's reluctance to impose a penalty from the outset and the passage of time before it elected to do so, underscore the difficulty in evaluating the conduct at issue. While Pruss' behavior was admittedly unwise, even foolhardy, it was not so degenerate as to warrant the total disgorgement of fees. Therefore, we reverse that portion of the bankruptcy

court's order requiring Pruss to disgorge all fees earned.  We reduce the disgorged amount to $43,354.21, reflecting the payment Pruss received from Sauer.

### Conclusion

We affirm that portion of the bankruptcy court's order disallowing additional fees, but reverse the portion requiring the disgorgement of  all fees.  Instead, we reduce the amount of disgorgement to $43,345.21.

A true copy.

Attest:

CLERK, UNITED STATES BANKRUPTCY APPELLATE PANEL FOR THE EIGHTH CIRCUIT.