# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

04-6075EM

_____

In re:                                      *
                                            *
Tri-River Trading, LLC,                     *
                                            *
          Debtor.                           *
                                            *
                                            *
Jody DeBold,                                *
                                            *          Appeal from the United States
          Plaintiff-Appellant,              *          Bankruptcy Court for the
                                            *          Eastern District of Missouri
          v.                                *
                                            *
E. Rebecca Case,                            *
                                            *
          Defendant-Appellee.               *

_____

Submitted:  June 24, 2005
Filed: August 17, 2005

_____

Before DREHER, FEDERMAN, and VENTERS, Bankruptcy Judges.

_____

DREHER, Bankruptcy Judge.

        This is an appeal from the bankruptcy court's grant of judgment in favor of
Appellee, the chapter 7 Trustee for Debtor.  Appellant commenced this declaratory
judgment action seeking to have the bankruptcy court determine that she, not Debtor,
owned $700,000 of the gross proceeds of an $800,000 settlement sum which had been

paid, but not distributed, prior to the date creditors commenced an involuntary bankruptcy proceeding against Debtor. For the reasons stated below we reverse with instructions to enter judgment for the parties in the amounts determined by this decision.

## FACTS

A.     The Formation of Debtor, Tri-River Trading, LLC

In 1999, Appellant, Jody DeBold (DeBold) and Jersey County Grain Company (Jersey Grain) formed Debtor, Tri-River Trading, LLC (Tri-River), a Missouri limited liability company. The company was to engage in the business of trading river barge traffic. DeBold, who was in her late 30s, agreed to leave her position at another company and devote full time to serving as the managing member of the LLC. For several years prior, DeBold had been successfully engaged in river barge trading and had been averaging about $100,000 per year in income.

DeBold was encouraged to enter into this transaction by Phil Thornton, the general manager of Jersey Grain. Thornton provided DeBold with pro formas which projected financial success and promised that Jersey Grain would use Tri-River for all its barge needs. His projections were based on this assumption. DeBold asserted that, based on these projections and representations, she invested $100,000 of her own money in Tri-River and spent nearly four years trying to make it successful. Jersey Grain also made a $100,000 capital contribution.

DeBold and Jersey Grain signed an Operating Agreement as the only two members of the LLC. Each was to own 50% of the company. Article 4.1 of the agreement provided that DeBold, as manager, would have exclusive control of the company's day-to-day operations and that the manager need not seek the consent of the other members prior to making any decisions affecting the company which were

2

made in the ordinary course of business. Article 4.5 covered decisions outside the ordinary course of business, including the sale, lease, mortgage or pledge of all or substantially all of the assets of the company. These decisions needed to be approved by both DeBold and Jersey Grain.

The agreement provided that DeBold would receive a salary of $70,000 in Year 1, $75,000 in Year 2, $75,000 in Year 3, and $80,000 in Year 4 of the company's operations, plus a bonus in the amount of 10% of its net profit each year. The Operating Agreement, Article 11.3, further provided that no member or manager would be liable to the company or to the other members for actions taken in good faith, in the absence of some proof of gross negligence or misconduct. This Article went on to state that:

> Any act or omission of any Member or Manager, the effect of which may cause or result in loss or damage to the Company or to the other Members or Manager, if done pursuant to the advise [sic] of legal or accounting counsel, shall be conclusively presumed not to constitute misconduct or gross negligence.

Article 15.1 of the Operating Agreement also provided that "[n]o Member, Manager or Assignee shall be liable to the Company or to any other Member, Manager or Assignee by reason of its actions in connection with the Company, unless otherwise provided in this Agreement, except in the case of actual fraud, gross negligence or willful misconduct."

The company commenced business but did not do well. Even though the market was not optimal, under DeBold's management Tri-River made a small profit in its early months of operation. Within a year after the company was formed, Thornton made sexual advances towards DeBold which she rebuffed. Thereafter, Jersey Grain ceased doing business with Tri-River. Before it took this action, Jersey

3

Grain obtained a legal opinion in which its counsel advised Jersey Grain that it had no obligation to deal exclusively with Tri-River. Thornton also was able to persuade Tri-River's bank to stop lending operating capital to the LLC.

## B.    The State Court Lawsuit and Settlement

When it became clear that Tri-River could not survive without Jersey Grain's business, DeBold tried to unwind the company's future commitments for barge traffic and then closed its doors. This cost the company about $877,000. DeBold and Tri-River then commenced an action in state court against Jersey Grain and Thornton, its General Manager, and Hugh Moore, Jr., its President.[1] Their joint complaint contained six counts. In Counts I and II, plaintiffs asserted a cause of action for breach of a written contract and a cause of action for breach of an oral contract. In Counts III and IV, plaintiffs asserted that DeBold had been induced to enter into the agreement based on the intentional and negligent misrepresentations of Thornton and Jersey Grain regarding future business and profits. In Count V plaintiffs claimed that defendants had tortiously interfered with Tri-River's futures contracts and its banking relationship. And, in Count VI plaintiffs claimed that defendants had breached fiduciary duties to them.

Plaintiffs were represented by Philip Corwin. DeBold and Tri-River both signed a contingency fee agreement with Corwin's firm promising to pay him a

---

[1]In the stipulation of facts filed prior to the trial in bankruptcy court, DeBold stated that she was prepared to prove in her state court action that in December 2000 Jersey Grain sold its interest in Tri-River to an employee of Jersey Grain for $1.00. Any such sale would have been a violation of Article 10.2 of the Operating Agreement which permitted the assignment of membership only upon written consent of the majority of the members (there being only two members of the LLC). Since DeBold did not consent, any attempted sale was invalid and Jersey Grain remained as a member of the LLC at the time of the lawsuit in state court as well as on the date of the bankruptcy filing.

guaranteed contingency fee, plus expenses. Tri-River paid Corwin's firm an initial retainer of $2,000 and over time paid an additional $20,000 in costs as the matter progressed towards trial.[2]

During the pre-trial preparations, plaintiffs' damage expert, Thomas Hoops, issued a written report in which he concluded that both DeBold and Tri-River had incurred damages as a result of the defendants' actions. He set DeBold's damages at $734,000, made up of the difference between the salary she would have received and her salary while at Tri-River; her $100,000 investment; and, the present value of her future lost earnings following Tri-River's collapse. The same report set the company's damages at $2.682 million, including the loss incurred in unwinding its futures contracts ($877,238), the $200,000 investors' lost capital contributions, and over $1.6 million in future lost profits. Hoops made no independent analysis of Tri-River's lost future profits. Instead, he relied solely on the figures Thornton had projected in the pro formas.

On the day of trial, before the trial commenced, defendants paid $800,000 to plaintiffs to settle the case. The settlement agreement provided for dismissal of the case and the exchange of mutual general releases. It did not apportion the settlement proceeds between plaintiffs. Mutual Services Casualty Insurance Company issued its check for $200,000 on behalf of its insured, Jersey Grain. Jersey Grain issued its check for the remaining $600,000. Both checks were made payable to DeBold, Tri-

---

[2]The bankruptcy court thought it important that DeBold paid no portion of the retainer or the costs incurred during pretrial. However, DeBold did commit to pay her pro-rata share of legal fees and expenses in the retainer agreement, and she acknowledged throughout that she was responsible for her pro-rata share of fees and costs. We do not find the fact that the LLC advanced costs during the litigation to be of any importance in determining how the settlement should be split between the plaintiffs. In contingency fee cases these matters are generally resolved at the conclusion of the case.

5

River and Corwin's firm, as joint payees. The checks were deposited in Corwin's trust account. Shortly thereafter, disgruntled creditors of Tri-River filed an involuntary bankruptcy case and an order for relief issued. DeBold signed Tri-River's bankruptcy schedules, which listed $67,000 in net settlement proceeds as an asset of the bankruptcy estate.

C.     The Declaratory Judgment Action in Bankruptcy Court

When the Trustee refused to agree with DeBold's contention as to her share of the settlement proceeds, DeBold commenced this declaratory judgment action in bankruptcy court. She asserted that she had agreed to the settlement on her own behalf and on behalf of the company based on the assumption that $700,000 would be paid to her and $100,000 to Tri-River, each minus their respective attorney's fees and costs. The Trustee answered, asserting that the full settlement belonged to the estate. The Trustee also commenced a third party complaint against Corwin's law firm and, by agreement of the parties and the petitioning creditors, the law firm deposited in the court registry $528,830.38. This amount was arrived at by deducting $266,640.00 in attorney's fees and an additional $4,529.62 in unpaid expenses from the $800,000 settlement proceeds.

Prior to trial the Trustee made a motion in limine seeking to exclude Corwin from testifying as an expert on the law. The bankruptcy court granted that motion.

In her opening statement, the Trustee changed direction slightly. She asked that the settlement be allocated 1/9th to DeBold based on her $100,000 investment and 8/9 to Tri-River based on its $800,000 loss in unwinding the barge trading contracts. The parties also stipulated to certain facts. DeBold called two witnesses, DeBold and Corwin. She also offered portions of the deposition testimony of the damages expert, Hoops. The Trustee offered no witnesses of her own. Instead, she

relied on a series of exhibits she introduced as well as portions of Hoops's deposition testimony and limited excerpts of DeBold's deposition testimony.

DeBold testified that she had agreed to settle for $800,000 based on a split of 1/8 to Tri-River and 7/8 to her because, based on what she had learned during discovery, she had come to believe that the company's claims were weak and that her claims were, in contrast, strong. She acknowledged that Jersey Grain had refused her request that this allocation appear in the settlement agreement. She also testified regarding Thornton's misrepresentations regarding the financial prospects for the venture and Jersey Grain's commitment to deal exclusively with Tri-River. She testified that her claim for damages consisted of her $100,000 lost investment in the company, the differential in wages earned while at Tri-River, and lost future income.[3] Finally she testified that she believed her claims based on Thornton's sexual advances were strong, especially because Jersey Grain's insurer had paid $200,000 to settle the claim.[4] However, she was not allowed to testify as to Corwin's valuation of the

---

[3]In its findings the bankruptcy court said, "DeBold claims that she incurred actual losses of $520,000 based on her investment, her lost investment, and her lost salary. DeBold avers that out of the Settlement, $700,000 belongs to DeBold . . . ." DeBold v. Case (In re Tri-River Trading LLC), 317 B.R. 65, 70 (Bankr. E.D. Mo. 2004). In fact, DeBold always claimed more than that. In state court, plaintiffs had prepared to establish that DeBold's personal claim exceeded $700,000 and in this trial she testified that she believed her damages were even greater.

[4]The bankruptcy court said, "DeBold alleges that $200,000 of the Settlement was provided through insurance coverage that was available only with respect to her separate claims for sexual harassment. DeBold presented no evidence to support this allegation." Id. at 69-70. To the contrary, DeBold testified that she learned that Jersey Grain's insurer paid $200,000 to settle a non-employer sexual harassment claim. Defendants themselves introduced the insurance company's check and, in addition, a letter from DeBold to the Trustee in which she stated that "we know positively that the one insurance company paid a minimum of $200,000 of the total settlement, based on their coverage of the sexual harassment . . . ."

parties' claims vis-a-vis each other. The bankruptcy court ruled that, because Corwin was in the courtroom, her explanation of what he told her about the settlement value of their respective cases was not the best evidence. Thus, DeBold's testimony regarding the fact that she settled believing the company's claims were weak and her claims were strong was uncorroborated.

Corwin was then called as a fact witness for DeBold. At the commencement of his testimony, the court ruled that an attorney-client privilege existed between Corwin and Tri-River. Thus, the bankruptcy court ruled that, while Corwin could testify as to what he told DeBold about the strengths or weaknesses of her case, he would not be allowed to state what he told her, in her capacity as the manager of the company, about the settlement value of the company's case. Confined to testifying only as to his analysis of her claims, he testified that he told DeBold her claims under Counts III and IV were strong, made more so because the sexual advances gave her case jury appeal. He also testified that he had confidence in the strength of her damage claim, but told her she could not make a claim under Counts I and II because of the exculpatory language in Article 11 of the Operating Agreement. Corwin further testified that he had decided not to even submit the claim on Count VI to the jury because he thought it was barred by section 347.088.3 of the Missouri Statutes.[5] While the bankruptcy court would not allow Corwin to testify about the specifics of DeBold's damages, overall he was allowed to confirm that he told DeBold, and he still believed, that her claims under Counts III and IV were strong, both with respect to liability and with respect to damages. Finally, he explained that DeBold had never made nor intended to make an employee sexual harassment claim.[6] Rather, Corwin's trial strategy was to use the evidence of Thornton's sexual advances as corroborating evidence to show that defendants did intend to deceive and defraud, as alleged in Counts III and IV. The bankruptcy court excluded Corwin's notes of the opening

[5]Currently MO. STAT. ANN. § 347.088.4.

[6]Jersey Grain was not DeBold's employer.

8

statement he intended to give had the case gone to trial; these were offered in support of his statements regarding his trial strategy. He was allowed to testify that he thought Thornton's sexual misconduct was the lynchpin of his trial strategy, but he was never allowed to corroborate DeBold's testimony about what she had been told or he believed about the settlement value of Tri-River's case.[7]

In closing argument, the Trustee's counsel urged that the court should allocate the settlement by giving $56,314.49 to DeBold and $472,517.89 to Tri-River. He arrived at this number by deducting 1/3 of $800,000 (and $4,529.62 in unpaid costs) to arrive at the $528,830.38 on deposit in the registry. Then he deducted the $22,000 the company had paid to Corwin as a retainer and as further costs as the case proceeded. The Trustee then urged that this net amount, $506,830.38, should be split 1/9 to DeBold based on her $100,000 contribution to capital and 8/9 to the Tri-River based on its $800,000 in losses incurred in unwinding the futures contracts. He urged "that is the only fair way to do it."

D.     The Bankruptcy Court Opinion

In her opinion, the bankruptcy judge determined that the sole issue before her was "the manner in which the Net Settlement Proceeds should be apportioned." DeBold v. Case (In re Tri-River Trading LLC), 317 B.R. 65, 71 (Bankr. E.D. Mo. 2004). The court did not address DeBold's contention that Tri-River didn't own most of the net settlement amount because she had split the proceeds, 1/8 / 7/8, prior to the

---

[7]While the Trustee insisted on excluding Corwin's advice to DeBold about the settlement value of Tri-River's state court claims, the Trustee herself offered and the court received Defendant's Exhibit 9, a letter dated June 16, 2003. In that letter DeBold wrote to the Trustee stating: "Mr. Corwin was very frank with me when I considered choosing trial over settlement. He reminded me that our claims for the company were very weak, and that not only he knew it, but also Jersey's attorney knew that, the mediator had known and the expert witnesses knew."

bankruptcy filing. Instead, the bankruptcy court analyzed each count of the state court complaint and determined which of the plaintiffs had succeeded in proving its case. In other words, the bankruptcy court independently assessed the settlement value of each of the claims made in the state court action.

The bankruptcy court held that both Tri-River and DeBold had proved a breach of an oral or written contract under Counts I and II and that these actions caused $800,000 in damages to Tri-River in unwinding the futures contracts. The court further found that DeBold had not met her burden of proving damages because "[t]he sole basis for DeBold's damages claim is that she is no longer able to attain gainful employment in the barge freight trading industry," and the evidence to document this claim showed that DeBold had not sought work in the barge industry following Tri-River's collapse; the barge industry was in the doldrums; DeBold's reputation was scourged by her own inability to successfully run Tri-River; and, she was well compensated while working for Tri-River. The court further held that "[u]nder these circumstances, equity requires that the creditors in this case be paid by Debtor before DeBold is entitled to receive a distribution of profits," and cited In re BMW Group I, Ltd., 168 B.R. 731, 735 (Bankr. W.D. Ok. 1994) in support of her decision.[8] Tri-River Trading, 317 B.R. at 72.

Going on to Counts III and IV, the bankruptcy court held that DeBold had failed to prove her claims because she had not proven she was deceived as to Thornton's sexual intentions. The bankruptcy court said

---

[8]The BMW Group I case deals with the absolute priority rule in a cram-down scenario when confirming a plan of reorganization and the question of whether equity can make a capital contribution (new value to retain its equity position). The case has nothing to do with the factual or legal issues of this case. The Supreme Court definitively decided the new value issue in Bank of America Nat. Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship, 526 U.S. 434 (1999).

DeBold argues that Thornton misrepresented his true intentions in forming Debtor since Thornton's alleged purpose was to engage DeBold in a personal relationship. . . . [T]here is nothing in the record to suggest that Thorton intentionally provided information for the guidance of a limited group of persons to form Debtor. Thornton provided information for the purpose of engaging DeBold to form Debtor. Thornton's subsequent alleged improper acts fail to negate this fact.

Id. at 73. The bankruptcy court further held that even if liability for fraud and misrepresentation had been established, DeBold had been paid a salary while working for Tri-River and equity dictated she be denied damages because of that. Id.

On Count V the bankruptcy court held that Tri-River had shown that Thornton interfered with Tri-River's business contracts and had also established at least $877,000 in damages incurred in the unwinding of the futures contracts. While it did not analyze DeBold's proof on liability, once again the court held that, because DeBold received a salary during her years with Tri-River, DeBold's damage claim was speculative. Again, the court relied on the BMW Group I case for the proposition that it would be unfair for DeBold to receive anything if the unsecured creditors were impaired. Id. at 74.

Finally, as to Count VI, the bankruptcy court held that Tri-River had shown that defendants had breached their fiduciary duties to Tri-River under Missouri Statute section 347.088 by withholding their financial support from Tri-River. The court made no mention of DeBold's claim under this Count. Id.

In conclusion, the bankruptcy court held that Tri-River had proven its case on Counts I, II, V and VI, both with respect to liability and to damages and that DeBold had failed to meet her burden of proof to warrant a declaratory judgment in her favor.

Going beyond what the Trustee had asked for in closing argument, the court awarded all of the net settlement proceeds, $528,830.38, to Tri-River. Id. at 75.

DECISION

A.    The Issues on Appeal

DeBold makes three arguments on appeal. First, she asserts that the bankruptcy court erred in ignoring the fact that ownership of the settlement proceeds had been validly determined and agreed to prior to the filing of the bankruptcy petition. Second, she asserts that the bankruptcy court erred in holding that Tri-River had established its case under Counts I, II, V, and VI and that DeBold had failed to prove her case on all claims. Finally, DeBold asserts that the bankruptcy court erred in holding that the attorney-client privilege barred Corwin's testimony about the advice he gave to DeBold regarding the weaknesses of Tri-River's case, an error which she asserts went to the heart of the matter and was compounded when the court ruled that DeBold herself could not testify on this subject because her testimony about what he said was not the best evidence.

B.    Scope of Review

We review the bankruptcy court's factual findings for clear error and its legal conclusions *de novo*. Apex Oil Co. v. Sparks (In re Apex Oil Co.), 406 F.3d 538, 541 (8th Cir. 2005). We review evidentiary rulings for an abuse of discretion, according such decisions "substantial deference." Life Plus Int'l v. Brown, 317 F.3d 799, 803 (8th Cir. 2003)(*quoting* Gagnon v. Sprint Corp., 284 F.3d 839, 856 (8th Cir. 2002)). "An abuse of discretion occurs when the reviewing court 'has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" Pruss v. Pelofsky (In re Sauer),

12

222 B.R. 604, 608 (B.A.P. 8th Cir. 1998)(*quoting* United States v. Ortiz, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)).


C.      The Respective Ownership Rights of DeBold and Tri-River Were Not Validly Determined Pre-Petition

The filing of a bankruptcy petition, including an involuntary petition, creates a bankruptcy estate.  11 U.S.C. § 541(a).  The estate is comprised of all the legal or equitable interests in Tri-River's property as of the commencement of the case.  11 U.S.C. § 541(a)(1).  The extent and validity of Tri-River's interest in property is a question of state law.  Butner v. United States, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); Keller v. Johnson (In re Johnson), 375 F.3d 668, 669-70 (8th Cir. 2004). Thus, if, under Missouri state law, DeBold owned 7/8 of the net proceeds of the settlement at the commencement of the case, then that 7/8 interest was not property of the estate and the  bankruptcy court had no authority to make it property of the estate.

The Trustee had the initial burden to make a prima facie showing that Tri-River had an ownership interest in property; thereafter, the burden of proving that property was removed from the ambit of the estate under section 541(d) was on the party claiming the equitable interest.  First Federal of Michigan v. Barrow, 878 F.2d 912, 915 (6th Cir. 1989)("[H]aving asserted a constructive trust of which they were beneficiaries, the appellants assumed the burden of identifying the sums of their entitlements."); Daly v. Radulesco (In re Carrozzella & Richardson), 247 B.R. 595, 602 (B.A.P. 2nd Cir. 2000)("Once the Trustee established that the Debtor had control of the Account . . . then the burden of proof shifted to the Defendants to prove (1) that the Debtor had only legal title to the Defendants' money. . . ."); Davis v. Moon (In re

13

Usery), 158 B.R. 470, 472 (Bankr. W.D. Mo. 1993)(holding that in a turnover action the trustee bears the initial burden of proof to establish a prima facie case that the subject of the turnover action is property of the estate). In this case, the Trustee had the initial burden of showing that the estate had an ownership interest in the funds. The Trustee met her burden by showing that Tri-River was a plaintiff in the action, the settlement checks named Tri-River as a joint payee, and the funds could not be released without Tri-River's consent. The burden then shifted to DeBold to establish, by a preponderance of the evidence, that she owned the money in the account.

Debold's testimony that she agreed to the settlement, acting on her own behalf and on behalf of Tri-River, believing that the company would be paid only 1/8 of the net settlement proceeds was unchallenged. The real question, however, is whether DeBold had authority to make such an allocation while wearing two hats. We conclude that both Missouri law and the Operating Agreement foreclosed her taking such action without the consent of Jersey Grain.

Under the Missouri limited liability company statute, a member of an LLC may not enter into a transaction if the member is interested, without obtaining the approval of a majority of the LLC's members. Section 347.088.3 of the Missouri Statutes provides that unless the operating agreement provides otherwise, any member or manager of an LLC must account to the company and

> hold as trustee for it any . . . benefit derived by such person without the informed consent of more than one-half by number of disinterested . . . members from any transaction connected with the conduct of the business and affairs . . . of the limited liability company, or from any personal use by such person of the property of the limited liability company . . . .

14

MO. STAT. ANN. § 347.088.3.[9] This provision codifies for Missouri LLCs the duty of loyalty, with its attendant prohibition against self-dealing, which is one of the pillars of American corporate governance. *See, e.g.* Cantor v. Perelman, 414 F.3d 430, 2005 WL 1620323, *3 (3rd Cir. 2005); Moon v. Robinson (In re Palace of Mystery, Inc.), 241 B.R. 890, 894 (Bankr. W.D. Mo. 1999) (Section 351.327.1 of the Missouri statute requires a Board of Directors resolution for transactions between a corporation and its insiders.)[10] Thus, under section 347.088.3, DeBold had authority to settle the litigation, since Jersey Grain, the other member of the LLC, consented to the settlement. But she could not allocate the proceeds as she contends unless Jersey Grain consented, and it specifically did not do so.

Moreover, the operating agreement did not, as DeBold contends, authorize her to unilaterally make the allocation. DeBold's authority to make unilateral decisions under Article 4.1 of the Operating Agreement was limited to ordinary course transactions.[11] She had no authority to make decisions out of the ordinary course

---

[9]Formerly MO. STAT. ANN. § 347.088.2.

[10]    The duty of loyalty requires that directors act in good faith and in the reasonable belief that the action taken is in the best interests of the corporation. This duty prohibits self-dealing-type conduct, such as, misappropriation of corporate opportunities, taking excessive compensation, and utilizing corporate assets or information for personal gain.

*See* Robert B. Millner, *What Does it Mean for Directors of Financially Troubled Corporations to Have Fiduciary Duties to Creditors?*, 9 J. BANKR. L. & PRAC. 201, 204-05 (2000).

[11]Missouri law contains a similar default provision. MO. STAT. ANN. § 347.079.3(5) ("Except as provided in the operating agreement, the affirmative vote, approval or consent or all members shall be required to: . . . (5) Authorize

without the affirmative vote of a majority of the members, and this transaction-- settlement of the company's claims for over $2.6 million in damages--was definitively out of the ordinary course.

Therefore, it is irrelevant whether DeBold actually allocated the settlement prior to the filing of the involuntary case, because, even if she did, such an action would be void *ab initio* as *ultra vires*.[12]  This does not mean, however, that DeBold relinquished her interest in the settlement proceeds, only that the question of the allocation was properly before the bankruptcy court.

D.    The Bankruptcy Court Erred in Holding that DeBold Was Not Entitled to Recover Any Amount of the Net Settlement Proceeds and That Tri-River Had Established its Claims to the Entire Net Settlement Proceeds

1.    *DeBold's Claims: Counts III and IV*

The bankruptcy court held that DeBold had not proven a case of misrepresentation based on sexual harassment, and therefore could not recover under Counts III and IV.[13]  But, that was not what DeBold was claiming.  DeBold never asserted a sexual harassment claim.  Her attorney so testified.  While she alleged

---

any transaction, agreement or action on behalf of the limited liability company that is . . . not within the usual course of business of the limited liability company . . . .").

[12]*See* <u>Wring v. City of Jefferson</u>, 413 S.W.2d 292, 299-300 (Mo. 1967) (*ultra vires* acts are void *ab initio*).

[13]Tri-River had no claim under Counts III and IV.  Those Counts were based on intentional and negligent misrepresentation.  At the time the alleged misrepresentations were made, Tri-River was not in existence.

sexual harassment, and would use the sexual advances to establish background, her claim was for misrepresentation of the viability of the business based on Thornton's statements and his commitment that Jersey Grain intended to deal exclusively with Tri-River. Contrary to the bankruptcy court's holding, there was ample evidence in the record to suggest that Thornton intentionally provided information for the guidance of a limited group of persons to form Tri-River.[14] The pro formas were in evidence and DeBold testified that she received them before entering into the transaction. Had she gone to trial, we believe, based on the record in this case, that she could have made a submissible case against the defendants on these two Counts, and therefore her claims had significant settlement value.

The bankruptcy court also erred in holding that DeBold's damages were speculative. Again, the court misconstrued DeBold's position. DeBold's damage claim was never confined to a claim for lost future wages following the collapse of Tri-River. That was only one of the three elements of her damage claim. She also sought return of her investment of $100,000 and the differential in income received during the years that she operated Tri-River. These elements of her damage claim were either undisputed or supported, without challenge, in the Hoops report. The Hoops report served as the basis for the bankruptcy court's finding that Tri-River had

---

[14]To prevail on a claim of negligent misrepresentation a plaintiff must prove:

(1) the speaker supplied information in the course of his business; (2) because of a failure by the speaker to exercise reasonable care, the information was false; *(3) the information was intentionally provided by the speaker for the guidance of a limited group of persons in a particular business transaction*; (4) the listener justifiably relied on the information; and (5) due to the listener's reliance on the information, the listener suffered a pecuniary loss.

Kesselring v. St. Louis Group, Inc., 74 S.W.3d 809, 813 (Mo. Ct. App. 2002)(emphasis added).

17

established its damage claim. In the absence of some valid reason for doing so, and we find none in this record, the bankruptcy court acted inconsistently in rejecting the first part of that report (that severable to DeBold) and accepting the second part of the report (that severable to Tri-River). Either Hoops was a credible damage witness or he was not. The fact that DeBold failed to seek work in the barge industry following Tri-River's collapse, the downward trend in barge business, and the besmirching of her reputation in the barge industry after Tri-River's collapse, go to her claim for lost future wages, but they do nothing to challenge the undisputed fact that she invested $100,000 in the company and that she made significantly less than she would have made had she stayed with her prior employer.

Moreover, it makes no difference that DeBold was well compensated while employed by Tri-River, and the court erred in ruling that DeBold was equitably estopped from receiving damages while the creditors remained unpaid. We know of no principle of law which suggests that a manager of a company is required to give up agreed upon salary to pay creditors when business turns bad. Members of a Missouri limited liability company, like corporate shareholders, have no liability for the company's debts solely by reason of their membership in the LLC. MO. STAT. ANN. § 347.057; *see* JB Contracting, Inc. v. Bierman, 147 S.W.3rd 814, 819 (Mo. Ct. App. 2004)(owner of Missouri limited liability company cannot be held liable individually on a claim for unjust enrichment because the owner benefitted from the transaction only as a member of the LLC and not individually). And, the absolute priority rule, which the bankruptcy court used as support for her decision to deny DeBold's damages on equitable grounds, is a statutory rule applicable on the confirmation of Chapter 11 bankruptcy plans. It has nothing to do with DeBold's claim for damages. *See, e.g.* Clyde Bergemann, Inc. v. The Babcock & Wilcox Co. (In re The Babcock & Wilcox Co.), 250 F.3d 955, 960 (5th Cir. 2001)("By its plain text, the absolute priority rule applies only to the confirmation of a chapter 11 plan"). The rule provides that in a Chapter 11 reorganization equity should receive nothing

18

unless senior classes are paid in full.  11 U.S.C. § 1129(b)(2)(C)(ii); <u>In re Union Fin.</u> <u>Serv. Group, Inc.</u>, 303 B.R. 390, 423 (Bankr. E.D. Mo. 2003).

In the alternative, the bankruptcy court, although not articulating the argument, may have considered DeBold to have a fiduciary duty to creditors when she settled the litigation.  When a corporation becomes insolvent, "the fiduciary duty of directors shifts from the stockholders to the creditors."  <u>Federal Deposit Ins. Corp. v. Sea Pines</u> <u>Co.</u>, 692 F.2d 973, 976-77 (4th Cir. 1982), *cert. denied*, 461 U.S. 928 (1983). "[I]t is universally agreed that when a corporation approaches insolvency or actually becomes insolvent, directors' fiduciary duties expand to include general creditors." <u>In re Kingston Square Assoc.</u>, 214 B.R. 713, 735 (Bankr. S.D.N.Y. 1997).[15]  Even if this same rule applies with respect to managers of limited liability companies, as discussed below, nothing in this record suggests that DeBold accepted less than a reasonable settlement on behalf of Tri-River.

## 2.    *Tri-River's Claims: Counts I, II, and V*

---

[15]Opinions differ on the extent of the shifting of the fiduciary duty.  In <u>St.</u> <u>James Capital Corp. v. Pallet Recycling Assoc. of North America, Inc.</u>, 589 N.W.2d 511 (Minn. Ct. App. 1999), the court ruled that directors and officers owe no duty of care to the creditors of an insolvent corporation, and that their fiduciary duty does not extend beyond a prohibition against self-dealing and insider preferences.  In <u>New York Credit Men's Adjustment Bureau v. Weiss</u>, 305 N.Y. 1, 10 N.E.2d 397 (1953), the court articulated a duty to obtain the best results for creditors in a non-bankruptcy liquidation.  And in a widely discussed case, <u>Credit</u> <u>Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.</u>, 1991 WL 277613 (Del. Ch. Dec. 30, 1991), the court took a more expansive view of directors' duties in insolvency situations by prohibiting an officer and director from engaging in undue risk to benefit only shareholders to the detriment of creditors.  Regardless of the view, DeBold violated no fiduciary duty to creditors. She did not engage in self-dealing, did not receive a preference, and did not pursue a course of conduct that exposed creditors to undue risk.  She settled the litigation for what she considered to be the fair value of her claims and those of Tri-River.

Because all contracts involved in these Counts were Tri-River's, and not DeBold's, Counts I, II, and V belonged to Tri-River. *See* Ayres v. AG Processing Inc., 345 F. Supp. 2d 1200, 1216 (D. Kan. 2004) (managers and LLC are distinct entities for purposes of breach of contract suit). DeBold could recover on these counts only derivatively as a member of the limited liability company which was the party with standing to assert them. We conclude that Chapter 347 of the Missouri Statutes, when read with provisions of the Operating Agreement, rendered Jersey Grain and its agents Thornton and Moore immune from liability for the actions alleged in these three Counts.

Missouri, like many other states, has adopted a limited liability company statute. MO. STAT. ANN. § 347.010, et seq. (1993).[16] The statute contains certain minimal requirements for the establishment and operation of an LLC and in certain instances allows members of an LLC to agree otherwise in an Operating Agreement. MO. STAT. ANN. § 347.081. The statute also contemplates that, if the members agree, a Missouri limited liability company may be operated by a manager selected by its

---

[16]The limited liability statutes are designed to authorize a hybrid type of business entity which combines attributes of a partnership with attributes of the corporation.

> It is important to keep the history of LLC development in perspective when working with LLCs and court interpretation of LLC acts. . . . The typical LLC act is usually a hybrid of provisions culled from the individual state's partnership statutes and business corporation law. In some cases the provisions of the separate statutes are identical. This fact is not lost on the courts, which often look to the interpretation of the previously existing provisions in the partnership or corporation law to interpret the LLC acts and operating agreements.

David M. Hastings, Annotation, *Construction and Application of Limited Liability Company Acts*, 79 ALR 5th 689, 134 (2005)

membership.  MO. STAT. ANN. § 347.079.  The operations of a Missouri limited liability company are governed, therefore, by applicable provisions of Chapter 347 of the Missouri Statutes and the Operating Agreement.

Missouri's limited liability company statute codifies the principle of corporate governance that managers owe a duty of care to the shareholders by providing that the manager of a limited liability company must discharge his duties "in good faith, with the care a corporate officer of like position would exercise under similar circumstances." MO. STAT. ANN. § 347.088.1. But the statute goes on to provide that a member, manager, or other person performing duties for or with fiduciary duties to the LLC may rely in good faith on provisions of the operating agreement.  Mo. Stat. Ann. § 347.088.2(1).  Further, a manager of a Missouri LLC may reasonably rely on the opinions of professionals such as lawyers and accountants.  MO. STAT. ANN. § 347.090.[17]  Under Missouri law, members of a Missouri LLC can embellish upon

---

[17]Section 347.090 states that:

> 1.      Unless he has knowledge concerning the matter in question that makes such reliance unwarranted, in discharging his duties under the operating agreement, an authorized person is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:
>
> * * *
>
> > (2)    Legal counsel, accountants, or other persons as to matters such authorized person reasonably believes are within such person's professional or expert competence;
>
> * * *
>
> 2.      An authorized person is not liable for any action taken with respect to his duties under the operating agreement, or any failure to take such action, if he performs such duties in compliance with this section.

these statutory provisions, or otherwise agree. *See* MO. STAT. ANN. § 347.088.2(2). Article 11.3 of the Tri-River Operating Agreement did just that. It insulated Jersey Grain, as a member, for any wrongful acts in connection with the LLC except to the extent that those acts were based on gross negligence or misconduct and, consistent with Missouri Statute 347.090, it further immunized conduct by providing that any challenged action was conclusively presumed not to constitute misconduct or gross negligence if the member acted on advice of counsel.

Because Jersey Grain received the opinion of counsel before it took the acts alleged to be wrongful in Counts I, II and V, Jersey Grain (and its agents Thornton and Moore) were shielded from liability on these Counts both by Missouri Statute and by terms of the Operating Agreement.[18]

### 3. *DeBold's or Tri-River's Claims: Count VI*

Count VI alleged a breach of fiduciary duty owed by Jersey Grain towards Tri-River and DeBold. Except with respect to the duty of loyalty, a non-manager member of an LLC that has a manager has no duty to the LLC "solely by reason of acting in his capacity as a member." MO. STAT. ANN. § 347.088.4. Further, Article 15.1 of the Operating Agreement confirmed this when it provided that no member was liable to the company or to any other member by reason of actions taken in connection with the company "except in the case of actual fraud, gross negligence or willful misconduct." Count VI was based on the existence of a fiduciary duty between Jersey

MO. STAT. ANN. § 347.090. These provisions of Missouri's LLC statute, in essence, codify a business judgment rule for members of LLCs similar to that available to corporate management. *See* 12B FLETCHER CYCLOPEDIA OF PRIVATE CORP. § 5811 (2004); Millner, *supra* note 10.

[18]It goes without saying that, even if DeBold had a claim under Counts I, II or V, she, too, would be foreclosed from suit.

Grain, a member of Tri-River, and another member and the company. By statute and agreement, neither DeBold nor Tri-River had a claim for such liability.[19]

E.    The Bankruptcy Court Erred in Excluding Evidence

Finally, the bankruptcy court erred in excluding Corwin's testimony regarding the settlement value of Tri-River's case. There being no expectation of confidentiality among joint clients, there is no attorney-client privilege for communications received by such joint clients when the clients are in a dispute with each other.

> When two or more persons, each having an interest in some problem, or situation, jointly consult an attorney, their confidential communications with the attorney, though known to each other, will of course be privileged in a controversy of either or both of the clients with the outside world, that is, with parties claiming adversely to both or either of those within the original charmed circle. But it will often happen that the two original clients will fall out between themselves and become engaged in a controversy in which the communications at their joint consultation with the lawyer may be vitally material. In such a controversy it is clear that the privilege is inapplicable.

F.D.I.C. v. Ogden Corp., 202 F.3d 454, 461 (1st Cir. 2000)(*quoting* 1 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 91 at 335-36 (4th ed.1992)).

The clearly erroneous exclusion of this evidence would be reason alone to reverse as an abuse of discretion. Life Plus Int'l, 317 F.3d at 803. And, under ordinary circumstances we would remand for further proceedings to allow such an

---

[19]Having concluded that Counts I, II, V and VI are not actionable, we need not reach the question of Tri-River's damages.

evidentiary ruling to be corrected and to have the court hear Corwin's testimony in full. We decline to do so for the following reasons.

First, the erroneous evidentiary ruling turned out to be largely harmless because the court ultimately allowed Corwin's and Debold's testimony on why Corwin thought DeBold had no case on Counts I, II, V and VI. Most of the reasons he gave for discounting her claims on these Counts are equally applicable as a matter of law to Tri-River's claims on these Counts. Further, evidence that Tri-River's claims were weak was received when the trustee offered DeBold's letter which restated Corwin's advice to her on this subject.[20] Thus, the evidence was essentially received for a different reason. Second, the question of Tri-River's ability to succeed on its claims is largely a matter of Missouri law and the Operating Agreement. We, as an appellate panel, are as able as the trial court to apply such law and to read the document and we are convinced that an error has been committed. *See* Wintz v. American Freightways Inc. (In re Wintz Cos.), 230 B.R. 840, 844 (B.A.P. 8th Cir. 1999)(*citing* Waugh v. Eldridge (In re Waugh), 95 F.3d 706, 711 (8th Cir. 1996)). Finally, the case has remained pending for several years; the parties should not be further delayed.

CONCLUSION

In conclusion, Tri-River had little chance, if any, of succeeding on Counts I, II, V, and VI.[21] DeBold, on the other hand, had good claims under Counts III and IV, both with respect to liability and with respect to damages. Based on the foregoing, it would be appropriate to enter judgment for DeBold in the full amount on deposit, minus her fair share of costs advanced by Tri-River. DeBold has not asked for that. Instead, DeBold concedes that some portion may belong to Tri-River. We conclude that DeBold is entitled, as she requested, to 7/8 of the gross settlement sum, subject

---

[20]*See supra,* note 7.

[21]Of course, nor did DeBold for the same reasons.

to paying her pro rata share of expenses and costs, and Tri-River is entitled to the remainder.

Accordingly, we REVERSE the judgment of the bankruptcy court and remand with instructions to enter judgment for Debtor, Tri-River Trading, LLC, in the amount of $85,353.80 and for DeBold in the amount of $443,476.58 with the parties to share pro-rata accumulated interest on the amounts on deposit, if any.[22]

_____

[22]This amount is calculated from total settlement proceeds of $800,000 less attorney fees and expenses paid at settlement for net settlement proceeds of $528,830.38. Tri-River receives $66,103.80 (1/8 of the amount on deposit) plus $19,250.00 reimbursement from DeBold's share for 7/8 of the pre-litigation expenses advanced for a total of $85,353.80. The remainder of the net settlement proceeds of $443,476.58 is DeBold's share of the settlement.